28   *United States, et al. v.*
*County of Muskegon, et al.*                    No. 00-1170

*Baltimore,* 6 F.3d 1012, 1017 (4th Cir. 1993), suggests that the Court "has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place . . . ." (Citations omitted.) If this is the test, S.D. Warren flunks it. The record in the case at bar is a voluminous one, but we have searched it in vain for any concrete evidence that the company would have rejected a contract that incorporated regulations of the sort enacted by the county in its ordinances of 1994 and 1998. One can speculate that such an ordinance would have been a deal breaker, but speculation cannot suffice; we need proof, and S.D. Warren has pointed to none.

There is a second – and equally important – reason for concluding that the substantiality of the impairment we have hypothesized has not been demonstrated. The service agreement was lawfully terminated as of January 1, 2000, and S.D. Warren failed to show that enforcement of the 1998 ordinance resulted in any curtailment of the company's discharges of industrial pollutants into the system prior to the effective date of the termination. Neither did the company show that the ordinance interfered with any planned expansion of the volume of pollutant discharges prior to the termination date. On these facts, we see no basis for finding a "substantial" impairment of contract.

The same considerations require us to reject the company's state law breach of contract claim. The breach, if any, was *damnum absque injuria.* If there was a technical violation of the contract, the violation ended on January 1, 2000, without having caused the company any measurable damage – or at least any measurable damage that the company told the district court about. The court's denial of the company's motion for summary judgment was entirely proper.

For the reasons stated, we find no reversible error in the summary judgment ruling or in the granting of the applications for entry of the consent decrees. Each of the orders complained of is **AFFIRMED**.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0252P (6th Cir.)
File Name:  02a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

UNITED STATES OF AMERICA
and STATE OF MICHIGAN,
          *Plaintiffs-Appellees,*

CITY OF WHITEHALL, *et al.,*
          *Intervenor and New Party*
          *Plaintiffs-Appellees,*

          *v.*

COUNTY OF MUSKEGON,
          *Defendant-Appellee,*

S.D. WARREN COMPANY,
          *Intervenor*
          *Defendant-Appellant,*

BURDICK & JACKSON
LABORATORIES, *et al.,*
          *Intervenor Defendants.*

No. 00-1170

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 97-00486—Douglas W. Hillman, District Judge.

Argued:  April 26, 2001

Decided and Filed:  July 26, 2002

Before:  NELSON and BATCHELDER, Circuit Judges;
            FEIKENS, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Paul T. Sorenson, WARNER, NORCROSS & JUDD, Grand Rapids, Michigan, for Appellant.  Joan M. Pepin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Alan F. Hoffman, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, Steven F. Stapleton, PLUNKETT & COONEY, Grand Rapids, Michigan, Stephen C. Corwin, WILLIAMS, HUGHES, CORWIN & SININGER, Muskegon, Michigan, for Appellees.  **ON BRIEF:**  Paul T. Sorenson, Dennis J. Donohue, WARNER, NORCROSS & JUDD, Grand Rapids, Michigan, for Appellant.  Joan M. Pepin, John A. Bryson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Alan F. Hoffman, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, Steven F. Stapleton, PLUNKETT & COONEY, Grand Rapids, Michigan, Stephen C. Corwin, WILLIAMS, HUGHES, CORWIN & SININGER, Muskegon, Michigan, Michael B. Ortega, Patricia Mason, REED, STOVER & O'CONNOR, Kalamazoo, Michigan, for Appellees.

———————————

**OPINION**

———————————

DAVID A. NELSON, Circuit Judge.  Muskegon County, Michigan, operates a sewage treatment system under permits

———————————

[*] The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

U.S. 234, 242-44 (1978), and *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

As to step one, it is undisputed here that at least some provisions of the 1998 ordinance are in conflict with provisions of the discharge regulations (the "Exhibit D regulations") incorporated in the service agreement between the county and S.D. Warren.  Thus the local consent decree contains a passage reciting that the county and the municipalities "acknowledge that the 1998 Ordinance provisions governing the issuance of special alternative limits for BOD and suspended solids are in conflict with provisions of the original Exhibit D regulations . . . ."

The existence of the conflict does not necessarily mean that the ordinance impaired  S.D. Warren's contract, of course, given the fact that paragraph 8 of the contract authorized the amendment or repeal of the Exhibit D regulations, or the promulgation of new regulations, "if reasonably required for the proper functioning of the System . . . ."  Compliance with federal law would seem to be an obvious requirement for the proper functioning of the system, and it is far from clear to us that S. D. Warren sustained its burden of showing that the 1998 regulations went beyond the requirements of federal law.   The state court found that the 1994 ordinance "mothballed" more of the system's capacity than was required, however, and if this finding was correct, it would presumably mean that the 1998 ordinance also went further than it had to.  We are not bound by the state court judgment, but for purposes of analysis we shall assume that the 1998 ordinance did in fact impair the obligation of the contract between the county and S.D. Warren.

Does the record before us demonstrate that the impairment we have posited was "substantial?"  We think not.

The Supreme Court has provided little specific guidance on how we are to gauge the substantiality of an impairment, but *Baltimore Teachers Union v. Mayor and City Council of*

submits that the denial of its summary judgment motion is subject to review by this court *de novo*. In light of the scope of the local consent decree entered on December 16, 1998, however, the district court concluded that the subsequent summary judgment motion was really a request for reconsideration of the decree. Citing *Good v. Ohio Edison Co.*, 149 F.3d 413, 418 n. 9 (6th Cir. 1998), the United States argues that the denial of such a request is reviewed for abuse of discretion and that separate review is unnecessary where the underlying judgment is on appeal as well.

We need not decide whether the government's premise is correct. Even if it is not, and even if the "*de novo*" standard of review applies here, we are satisfied that the denial of the companies' motion for summary judgment should be affirmed. S. D. Warren has shown neither a violation of the Contract Clause of the United States Constitution nor a breach of contract redressable under state law.

The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Supreme Court has told us that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934)). The question whether, in a given case, a change in the law has impaired the obligation of the contract at issue represents only the first step in the analysis we have been instructed to follow. If we determine that there has been an impairment, we must then determine whether the impairment is "substantial." And if that question is answered in the affirmative, we must go on to determine "whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose." *Mascio v. Public Employees Retirement System of Ohio*, 160 F.3d 310, 313 (6th Cir. 1998) (citing *Allied Structural Steel Co. v. Spannaus*, 438

issued pursuant to § 402 of the Federal Water Pollution Control Act, 33 U.S.C. § 1342. The case at bar originated as a federal enforcement proceeding in which the United States sought to rectify alleged violations of the permits, the Act, and certain administrative compliance orders issued by the United States Environmental Protection Agency.

The appellant, S.D. Warren Company, is an industrial concern that discharges wastewater into the system. The company helped finance the construction and subsequent upgrading of the system, and for many years S.D. Warren and other industrial users were beneficiaries of service agreements – now purportedly terminated – declaring that "the intent and purpose of the System [is] to provide the maximum possible service to each Contractee . . . ."

Prior to the commencement of the present enforcement action, S.D. Warren and other private users of the system sued the county in a Michigan circuit court on a claim that the "maximum possible service" provision would be violated by enforcement of a newly-adopted county regulatory ordinance that allegedly had the effect of mothballing a significant portion of the system's capacity. The claim was decided in favor of the companies, and the county was enjoined from enforcing the ordinance.

The present federal action was commenced a year later, while an appeal of the state court judgment was pending. S.D. Warren and other industrial concerns intervened herein as defendants. The State of Michigan, joined initially as a defendant, was realigned as a plaintiff. Municipalities within the county – including the City of Muskegon, home of an S.D. Warren manufacturing plant – have also become plaintiffs in the federal case.

During the course of the proceedings below, the county gave notice that the service agreements would be terminated. After the notice was given, but before the stated effective date, the district court entered two consent decrees. The first

disposed of the municipalities' claims against the county on a basis that incorporated another regulatory ordinance, enacted four years after the one that had been enjoined, with terms substantially identical to those of its predecessor. The second consent decree, which disposed of the federal government's claims against the county and state, also incorporated the most recent ordinance.

S.D. Warren has appealed the consent decrees and a decision in which the district court rejected certain of the companies' defenses and denied a defense motion for partial summary judgment.[1]    Contending that the district court abused its discretion in finding the consent decrees fair and reasonable, the company submits that the arrangements sanctioned by the district court unconstitutionally impair and breach the service agreement with the county. Given the history of the proceedings in state court, the company contends that the new arrangements contravene principles of comity as well. Narrowing the focus of the latter contention at one point, the company's brief also suggests that, in light of the state court decision, we could dispose of this case on the theory that the federal courts lack jurisdiction.

We conclude that federal jurisdiction is not lacking here. We further conclude that the  district court did not err in holding, as it did, that the service agreement on which the company relies was lawfully terminated. The termination having been proper, and there having been no proof that any damages accrued as a result of the imposition of the new regulatory scheme prior to the effective date of the termination notice, the district court did not err in finding that there had been neither a redressable breach of contract rights nor an unconstitutional impairment of contractual obligations. Accordingly, and because we are not persuaded that the court

---

[1] The notice of appeal also named intervenor defendants Aventis CropScience USA LP and Genesco, Inc. as appellants, but they subsequently withdrew; the appeal is now being prosecuted solely by S.D. Warren.

Agreement" and that it contained a recital clause stating that "the parties desire to amend their prior Service Agreements." The new agreement was in no way dependent on the old ones, however, and its operative language included a provision explicitly stating that "[t]his Amended Service Agreement shall supercede all prior Service Agreements." Another provision of the superceding agreement incorporated the 1998 ordinance and affirmed that the 1980 version of the Exhibit D regulations, as amended, "shall be deemed of no force and effect."

The purpose of S.D. Warren's intervention, of course, had been to retain the perceived benefits of the 1980 version of the Exhibit D regulations and avoid the perceived detriments of the 1998 ordinance. Accomplishment of this objective was dependent upon retention of the prior service agreements – and we see no merit in the argument that the existence of an agreement that superceded the prior agreements across the board and expressly repudiated key provisions thereof somehow negated the revocation notice as far as the municipalities were concerned.

B

We turn now to S.D. Warren's contention that the district court erred in entering summary judgment against the companies on their third affirmative defense – the defense that the granting of relief to the plaintiff "may breach and unconstitutionally impair preexisting contractual obligations of the County . . . ." (The third affirmative defense also asserted that relief was barred by the doctrines of res judicata and collateral estoppel, but these assertions have been abandoned.)

The parties disagree as to the standard we should apply in reviewing the district court's disposition of the summary judgment motion – and they disagree as to whether separate review of that disposition is even necessary. Citing *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997), S.D. Warren

the company remains free to "alert" the court of appeals to "aspects of the [validity of termination] issue that were not raised before the district court."

This submission is, to say the least, a puzzling one. The validity of the purported termination of S.D. Warren's service agreement obviously had an important bearing on the fairness and reasonableness of the most controversial feature of the consent decrees – their approval of the regulatory ordinance by which Exhibit D of the service agreement was replaced. The district court was well aware of the importance of the question whether the termination was valid, and the court engaged in a protracted analysis of the only argument presented on this issue by the companies. That argument was rejected (in a portion of the opinion to which S.D. Warren has not taken exception on appeal), and it was against this background that the district court declared that "the county has *properly* terminated all prior service agreements . . . ." (Emphasis supplied.) Both in its opinion approving the local consent decree and in its opinion denying the summary judgment motion, the district court stated flatly that the termination "will become effective" with the arrival of the year 2000. If the companies had an additional argument as to why the termination should not be considered effective, it seems clear to us that the argument should have been presented to the district court.

Be that as it may, we are confident that if the argument had been presented when it should have been, the district court would have rejected it. And the likelihood of our disagreeing with the district court on this point can fairly be characterized as remote.

It is undisputed, after all, that the termination notice was sent to all service agreement contractees, municipal as well as private. The superceding agreement subsequently negotiated with the municipalities did not purport to revoke the termination notice and was not inconsistent with it. It is true that the new agreement was captioned "Amended Service

committed reversible error in its resolution of any other substantive issue, the challenged orders will be affirmed.

I

In the late 1960s, according to undisputed representations made in a brief that the companies filed below,

"the Municipalities and certain large industries within the County . . . decided to construct a county-wide sewer system. The purpose of the system was to accommodate both residential sewage needs and the needs of the established industrial base within the County. The parties decided to finance construction of the system through mixed funding. Specifically, $12.7 million of the $28.7 million initial construction cost was financed through federal and state grants. The remaining $16 million was to be raised by issuance of bonds facilitated by formation of a County Department of Public Works Board under the County Board and Department of Public Works Act ("DPW Act") (MCL § 123.731 *et seq.*). The DPW Act authorized duly formed county DPW boards to issue bonds for the acquisition or construction of sewer systems by counties and then secure their bond obligations by contracting with municipalities within the county to back the county bonds with their full faith and credit. (MCL §§ 123.741(2); 123.742.) The DPW Act did not, however, authorize counties to contract directly with private parties to guarantee bond payments. *Id.* The parties understood, however, that the financial participation of these large industries in servicing the bond debt was and is critical to keeping residential sewer rates low and, therefore, making the project feasible. Accordingly, the parties forged agreements that were consistent with the DPW Act, but that incorporated these industries into the funding structure."

Among the agreements "forged" by the parties prior to construction of the sewer system was a contract dated

May 21, 1971, between the City of Muskegon and Scott Paper Company. (Under the name "S.D. Warren Company," which denoted what was then an unincorporated division of Scott, that company owned and operated a pulp and paper manufacturing plant in the City of Muskegon.) The 1971 contract "authorized" the city to enter into an Access Rights Agreement with the county regarding the planned sewage disposal system.

In explaining this "authorization," the 1971 contract stated that the Access Rights Agreement "delineat[ed] in detail the procedures for the issuance of bonds by the County to finance the initial construction of the System . . . and the apportionment of the obligations to be assumed [by the municipalities] to the County for the payment of the debt service requirements (including interest and principal) for said bonds . . . ." The 1971 contract went on to obligate Scott (S.D. Warren) to pay the city a share of the latter's debt service commitment, the company's obligation being secured through the creation of a special assessment district the boundaries of which were identical to those of the 110 acre tract on which the pulp and paper plant was located. The contract further provided that "[t]he amount of the special assessments to be levied annually in said Special Assessment District shall be Scott's share of the cost of the initial construction of the System as determined by the formulae set forth in the 'Access Rights Agreement.'"

The Access Rights Agreement was entered into between Muskegon County and a number of municipalities, including the City of Muskegon, as of December 4, 1970. The agreement's formulae for determining the allocation of the debt service burden were based in part on the number of acres each municipality had within the sewage system service area, with the acreages of certain industries (including S.D. Warren) broken out separately. Another element in the formulae consisted of a figure equal to the higher of the actual daily volume of waste materials delivered to the system and a guaranteed minimum volume. The City of Muskegon

paragraph 12 of the Agreements since it has not terminated all of its Service Agreements. The County only terminated its agreements with the Companies. The state court may well have a different view on the continued vitality of the Companies' Service Agreements."

The possibility that the state court might have a view differing from the district court's on the continued vitality of the companies' service agreements is a red herring, we believe. The issuance of the notice of termination, to repeat a point that bears repetition, came long after entry of the injunction. The effectiveness of the notice was never adjudicated by the state court. And if the companies had truly believed that there was a failure properly to terminate the service agreements in accordance with paragraph 12, thus arguably rendering enforcement of the new regulatory ordinance a violation of the injunction against enforcement of the earlier ordinance, there would have been nothing to prevent the companies from initiating contempt proceedings before the state court. This they did not do.

An obvious procedural problem with the claim that the termination notice was ineffective because of a supposed failure to terminate the service agreements of all contractees is that this issue was never litigated in the district court. As the appellate brief of the United States points out, quoting *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991), "[a] long line of cases in this circuit strongly reinforces the principle that issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance."

The district court said that the county's compliance with the proviso regarding termination of all contractees' service agreements was an "undisputed" fact. But S.D. Warren's appellate reply brief submits that the district court never gave its "approval" of the termination of the service agreements – and the alleged absence of approval is claimed to mean that

the Service Agreements with *all* parties, effective January 1, 2000. The Municipalities and the County have since renegotiated replacement Service Agreement (without the participation of the Companies) that purport to abolish the Companies' contract rights. [Record citation omitted.] The Companies believe that the County's exercise of the termination clause in the Service Agreements was exercised in obvious bad faith, rendering the termination illegal under Michigan contract law . . . . However, the legality of the County's and Municipalities' termination of the Service Agreements and execution of replacement agreements between the County and Municipalities is not before this Court, since none of the parties amended their pleadings to address these claims." (Emphasis supplied.)

If, as claimed, the exercise of the termination clause was illegal under Michigan law, we confess ourselves unable to understand why the legality of the termination was not before the district court. The effectiveness of the termination of agreements incorporating the Exhibit D regulations would seem to have been highly relevant to the fairness and reasonableness of a consent decree sanctioning the replacement of the Exhibit D regulations with the new regulatory ordinance. Be that as it may, however, S.D. Warren has not pressed its bad faith claim on appeal. Any such claim has thus been abandoned. See *Bush v. Dictaphone Corp.*, 161 F.3d 363, 370 (6th Cir. 1998).

What S.D. Warren claims on appeal is that "[t]he County did not terminate *all* of the Agreements . . . ." (Emphasis supplied.) Instead, according to the company's latest insight, the county "terminated only the industrial agreements and amended the remaining service agreements with the Municipalities." Such, at least, is the companies' "belief;" as the appellate brief puts it at a later point,

"the Companies believe that the County has not properly terminated the Service Agreements in accordance with

(8,072 acres) had a guaranteed minimum volume of 16.5 million gallons per day. S.D. Warren (110 acres) had an initial guaranteed minimum volume of 16 million gallons per day, with a reduction to 12 million gallons per day after 1982.

In addition to contracting with the city to underwrite part of the initial cost of constructing the system, S.D. Warren contracted to pay the county a share of the operating costs in exchange for the county's providing sewage treatment service. Although not made part of the record, the company's contract with the county took substantially the same form as that of a service agreement entered into as of October 3, 1973, between the county and Genesco, Inc., another industrial user. (A partially executed copy of the Genesco service agreement is included in the record.) Similar service agreements were also entered into between the county and the municipalities.

Paragraph 5 of the service agreement provided for establishment of a uniform service charge, with sewer service being furnished to all contractees at the uniform rate. Paragraph 8 of the service agreement incorporated as "Exhibit D" a set of county regulations governing discharges into the system. (The same Exhibit D also formed part of the 1970 Access Rights Agreement between the county and the municipalities.)

Paragraph 8 of the service agreement further provided as follows:

"In accordance with the procedures set forth therein, the County may amend or repeal any such regulations, or promulgate new regulations if reasonably required for the proper functioning of the System and/or to achieve equity among users thereof; and, provided, however, that any such regulations or amendments thereto shall not be more stringent than those required by state and federal agencies . . . ."

Although the service agreement had no fixed term, paragraph 12 provided for termination upon 24 months' notice:

"The term of this agreement shall commence on the date hereof, and may be terminated upon twenty-four months prior written notice given by one party to the other, but such termination shall not become effective prior to the date upon which all bonds issued to finance the initial construction of the System shall have been paid in full; provided, however, that the County may not so terminate this agreement unless it at the same time terminates its like agreements with all other contractees."

Section III-B of the Exhibit D regulations contained the "maximum possible service" language that lies at the heart of S.D. Warren's case. Captioned "Purpose of System, Exceptions and Surcharges," Section III-B read, in its entirety, as follows:

"It is the intent and purpose of the System to provide the maximum possible service to each Contractee and person served by the System, consistent with the preservation of public health and safety, the fulfillment of obligations under state and federal law, the successful functioning of the System and fairness to all parties.

"To this end and subject to the foregoing principles the County may establish a surcharge pursuant to Sec. V and X hereof, and the Director shall have the discretion to permit a Contractee or party served by a Contractee to discharge into the System waste fluids and solids whose constituent or parameter levels do not meet those prescribed in Sec. III-A hereof, as they may from time to time be amended. Such exceptions may contain such conditions and be issued for such period of time as the Director may deem necessary or advisable.

note 4, *supra*) to have the county to issue a notice terminating all service agreements in accordance with paragraph 12 thereof.

Paragraph 12, it will be recalled, says that subject to certain conditions, "this agreement . . . may be terminated . . . ." The consent decrees might have been unfair and unreasonable if S.D. Warren's service agreement had said that the agreement "may not be terminated," but it said just the opposite.

One of the conditions prescribed by paragraph 12 for the termination's becoming effective, we should probably mention, was that "all bonds issued to finance the initial construction of the System shall have been paid in full . . . ." That condition is not an issue. In December of 1998, as we have seen, the county and the municipalities were in agreement that the original bond issue had been fully repaid. See note 2, *supra*. S.D. Warren has never contended that the agreement was in error and that there were original bonds which remained unpaid.

S.D. Warren does suggest on appeal that the county failed to satisfy the final proviso of paragraph 12, a proviso stating that "the County may not so terminate this agreement unless it at the same time terminates its like agreements with all other contractees." The suggestion comes too late to be taken seriously.

No such claim was made in the district court. There it was suggested that although the issue was not before the court, the termination clause had been exercised in "bad faith" – a circumstance "rendering the termination illegal under Michigan contract law." And subject to the bad faith question, the companies seemed to acknowledge below that all contractees' service agreements had in fact been terminated. This is what the companies said in their brief opposing entry of the local consent decree:

"Last December, the Municipalities persuaded the County Department of Public Works Board to terminate

III

A

In deciding whether to approve the proposed consent decrees, the district court was required to determine whether they were "fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (6th Cir. 1986). The district court held that the decrees passed this test; S.D. Warren contends that the court abused its discretion in so holding.

The local consent decree "was not a fair or reasonable settlement of the claims between the Municipalities and the County," S.D. Warren argues, "due to its impact (and purportedly binding effect on) the Companies, who did not consent to the judgment." Further, says S.D. Warren,

> "The consent judgment also allowed the County to frustrate the prior state court judgment and injunction, further rendering the consent judgment an unreasonable means to resolve the Municipalities' claims against the County. Finally, the Companies contend that the district court also erred in approving the consent judgment between the United States, the State and the County since it incorporates the [1998] Ordinance as the basis for settling the United States's and State's [Industrial Pretreatment Program] claims against the County."

Although it is true that the companies did not consent to either decree, both of which purported to force the 1998 ordinance down the companies' throats, we are not persuaded that it was an abuse of discretion for the district court to find the decrees fair and reasonable. We have already explained that the decrees did not frustrate the prior state court judgment. And the non-consent of the companies is immaterial, in our view, given the critically important fact that long before the decrees were entered, the municipalities had "availed themselves of the local political process" (see

> "The amount of any surcharge shall be limited to an amount reasonably estimated to cover the incremental costs incurred by the System in handling such materials."

With the above-described network of contractual undertakings as a backdrop, the county created a board that issued bonds to finance a portion of the initial cost of building a county-wide sewage treatment system. The system (which had two separate treatment plants) was completed and began operation, under United States Environmental Protection Agency permits, in 1975. We presume that S.D. Warren regularly paid annual special assessments to the city and monthly service charges to the county while discharging wastewater from the pulp and paper plant into the system in accordance with the "Exhibit D" regulations.

On April 16, 1980, the county amended the Exhibit D regulations to relax certain discharge limits. The original regulations had imposed specific numeric limits on pollutant concentrations, subject to discretionary waiver by the county. The amended regulations did away with this "uniform concentration level" system and replaced it with one allowing any discharge of pollutants that did not exceed prescribed criteria "by an amount which may cause or does cause interference" with the system. ("Interference" was defined as any discharge that "causes or significantly contributes to a violation of any requirement of" the relevant EPA permits.)

In 1988 the county bound itself by a contract with the municipalities to increase the capacity of the treatment system through the construction of improvements estimated to cost more than $46 million. Part of this cost was to be funded through a $23 million bond issue, the debt service on which was to be covered by payments from the municipalities.

In 1989, according to the complaint filed by the municipalities that have intervened in this lawsuit, the county purportedly entered into a "Capacity Allocation Contract" with the municipalities and the industrial concerns that were

parties to service agreements with the county. The Capacity Allocation Contract, an unsigned and undated copy of which was annexed to the intervening municipalities' complaint, approved the construction of the improvements and specified how the hydraulic capacity of the improved system was to be apportioned. A volume of 16.33 million gallons per day (out of a total of 44.32 million gallons per day) was allocated to S.D. Warren. The contract further provided that "[a] Service Agreement Industry [S.D.Warren, *e.g.*] shall pay debt service . . . attributable to its allocated capacity to, or on behalf of, its [municipality]." The improvements in question are said to have been substantially completed in 1992.

It is clear that the bonds issued to finance the initial construction of the system have been paid in full.[2] It is less clear whether and to what extent S.D. Warren is currently liable to pay debt service on bonds floated to help fund the improvements. We asked about this at oral argument, and S.D. Warren's lawyer was unable to enlighten us. We shall nonetheless assume, for purposes of this opinion, that S.D. Warren does have some residual debt service obligation under the 1989 Capacity Allocation Contract.

The series of administrative steps that ultimately led to the filing of the present enforcement proceeding began in November of 1991, when staff members of the Michigan Department of Natural Resources conducted an audit of the county's "pretreatment" program. The ensuing audit report, issued in May of 1992, identified several alleged violations of federal pretreatment regulations and permit requirements. Cited as one of the violations was the absence of specifically quantified limitations on discharges of pollutants into the system.

---

[2]Under the caption "Agreed Facts and Circumstances," the first of the consent decrees (entered in December of 1998) states that "[t]he original bond issue has been fully repaid."

have a faintly hollow ring,[4] but surely we have jurisdiction whether to decide the argument is correct.

For another thing, the local consent decree was entered on December 16, 1998. As we have seen, the decree incorporated both the 1998 regulatory ordinance and the Amended Service Agreement between the county and the municipalities. That agreement, as the decree stated, "is to have immediate and superseding force and effect over all previously executed Service Agreements, whether between the County and Local Units, or between the County and Service Agreement Industries." But for the district court's approval of the county's new agreement with the municipalities, the service agreement between the county and S.D. Warren would arguably have remained in effect until at least January 1, 2000, the date given in the termination notice itself. And surely we have jurisdiction to decide whether the district court erred in its handling of the problem created by the "superseding" of the service agreement (and the replacement of the Exhibit D regulations by the 1998 regulatory ordinance) more than a year before the service agreement was ostensibly scheduled to expire.

There are additional reasons for thinking that the issuance of the termination notice did not render this case moot, but we shall forego the temptation to explore them. Our jurisdiction is reasonably clear, we believe, and even the most patient of readers would doubtless welcome our foregoing further preliminaries so we can now turn, at last, to the merits of the company's appeal.

---

[4]On January 30, 1998, S. D. Warren and other industrial users moved to dismiss the municipalities' claims on the ground, among others, that "these municipalities have availed themselves of the local political process and have already obtained the ultimate relief they seek in this action – i.e., termination of Intervenor Defendants' contractual discharge rights."

been given of the termination of the service agreements. It is not the 1994 ordinance that is now at issue; the ordinance at issue here is one adopted in 1998, after the termination notice had been given. The provisions of the two ordinances are essentially the same, to be sure, but the circumstance that made the 1994 ordinance problematic – the existence of service agreements that appeared to be at odds with the ordinance – was changed rather dramatically in 1997 (after entry of the state court injunction, to repeat, and prior to passage of the 1998 ordinance) by issuance of a notice terminating the agreements. We do not read *Gottfried* as compelling us to hold that the district court should have stayed the present litigation pending a decision by the state court on the effectiveness of a termination notice that was not issued until more than 18 months after entry of the state court injunction and that has not to this day been challenged in the state court. The *Gottfried* decision rested, after all, on considerations of "equity, comity, and our federalist judicial system," see 142 F.3d at 330 – and these considerations hardly compel the conclusion that the federal district court abused its discretion by adjudicating questions which the state court has never had occasion to consider and could not possibly have considered prior to issuance of its injunction.

### B

In their briefs on appeal, the United States and the other appellees raise a jurisdictional issue of their own: they contend that the county's termination of the service agreements rendered this appeal moot. We find the appellees' jurisdictional arguments no more persuasive than the jurisdictional argument raised (sort of) by the appellant.

For one thing, S.D. Warren maintains that the validity of the purported termination is suspect – and the company argues that only the state court can decide whether the termination was effective. The company's argument may

In July of 1992 the United States EPA issued an order in which it found among other things that the county had failed to submit a proper Industrial Pretreatment Program. The EPA ordered the county to bring itself into compliance.

The county eventually responded by adopting an ordinance that returned to the original system of specific numeric limitations, subject to waiver, on discharges of pollutants into the system. The ordinance, which was enacted in June of 1994, purported to supersede the 1980 version of the Exhibit D regulations. The industrial users complained that the new limits on pollutant concentrations were set so low that the effect of the ordinance was to "mothball" much of the system's capacity. This, the companies said, violated their contract right to receive "the maximum possible service."

In June of 1995 S.D. Warren and other industrial users filed suit against the county and the Michigan Department of Natural Resources in a Michigan circuit court. None of the municipalities was joined as a party. The gravamen of the complaint was that the rights enjoyed by the plaintiffs under their service agreements had been unconstitutionally impaired.

In June of 1996 the Michigan circuit court issued a decision in favor of the plaintiff companies. The court held that the service agreements (including the Exhibit D regulations incorporated therein) were valid contracts; that the companies enjoyed constitutionally protected rights flowing directly from the contracts or bestowed on the companies as third party beneficiaries; and that in view of the "maximum possible service" provision of the Exhibit D regulations, the 1994 ordinance unconstitutionally impaired the obligations of the companies' contracts. Permanently enjoined from enforcing the ordinance against the companies, the county and the state appealed to a Michigan appellate court.

In June of 1997, while that appeal was pending, the United States commenced the present enforcement action against the

county and the state in the United States District Court for the Western District of Michigan. The complaint alleged, among other things, that the EPA's issuance of permits for the operation of the sewer system meant that the county was required to have a proper Industrial Pretreatment Program in place under 40 C.F.R. Part 403; that the county had failed to implement and enforce such a program; that the county had likewise failed to comply with various EPA orders; and that the system was being operated in violation of § 301 of the Federal Water Pollution Control Act, 33 U.S.C. § 1311. The complaint sought an order directing compliance, assessing civil penalties against the county, awarding relief against the state pursuant to 33 U.S.C. § 1319(e), and allowing the United States its costs and disbursements.

A motion for intervention as parties plaintiff was filed by certain of the municipalities, including the City of Muskegon, in September of 1997. The municipalities alleged, among other things, that the service agreements between the county and the industrial users had resulted in violations of the EPA permits, various EPA compliance orders, and the terms of monetary grants received by the county. The municipalities sought injunctive relief and a declaration that the service agreements were void. (Other municipalities were subsequently joined as parties defendant, but, like the state, were realigned as plaintiffs.)

S.D. Warren and other industrial users likewise moved to intervene, tendering an answer to the complaint in October of 1997. The answer set forth various affirmative defenses, the third of which read as follows:

> "The relief Plaintiff seeks may breach and unconstitutionally impair preexisting contractual obligations of the County to industrial and municipal users of the Muskegon County Wastewater Management System. To the extent Plaintiff's Complaint raises claims or issues related to Intervener Defendants' contracts with the Defendant County, such claims are also barred by the

companies' third affirmative defense. We are satisfied that jurisdiction was not lacking.

As the companies properly acknowledge, this court has held – in a decision, we would emphasize, that remains binding upon subsequent panels – that "[t]he *Rooker-Feldman* doctrine does not apply to bar a suit in federal court brought by a party that was not a party in the preceding action in state court." *United States v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995) (citation omitted). In the present situation, the United States was not a party in the state court action. Neither was any of the municipalities. *Owens* therefore compels the conclusion that the *Rooker-Feldman* doctrine does not bar federal jurisdiction here.

*Rooker-Feldman* aside, an argument can be made that although jurisdiction attached, the district court should have stayed the present proceeding until such time as the municipalities and the county might ask the state circuit court to modify its injunction. See *Gottfried v. Medical Planning Services, Inc.*, 142 F.3d 326, 332 (6th Cir. 1998) ("we hold that a federal court should abstain when a nonparty to a state court injunction brings a First Amendment challenge to the injunction in federal court before requesting relief from the state court").

The case at bar, of course, is about as far removed from a First Amendment case as one can imagine; unlike *Gottfried*, which involved a citizen's right to picket an abortion clinic, the instant action involves claims by the United States, the State of Michigan and the City of Muskegon that there have been ongoing violations of the rules and regulations governing the operation of the county's sewage treatment plants. More significantly, however, the plaintiffs in the case at bar have not brought a direct challenge to the state court injunction on any ground, First Amendment or otherwise.

The injunction, it is important to remember, barred enforcement of a 1994 ordinance adopted before notice had

in federal district court by raising issues 'inextricably intertwined' with the issues previously litigated in state court. See *Gottfried v. Medical Planning Services, Inc.*, 142 F.3d 326 (6th Cir. 1998). Generally, courts have not applied the Rooker/Feldman doctrine to bar claims by parties that were not parties to the prior state court proceedings. See e.g., *United States v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995.) However, the courts do not agree on this approach. See, e.g., *T.W. v. Brophy*, 124 F.3d 893 ([7th] Cir. 1997). Indeed, a district court in this circuit has ruled that the doctrine may apply to a party who, though not a party to the prior state court litigation, had an opportunity to litigate in the state court. *Hart v. Comerica Bank*, 957 F.Supp. 958, 970-71 (E.D. Mich. 1997). Since the doctrine is intended to prevent federal courts from, in effect, reviewing state court judgments, the doctrine can and should be applied to parties who are attacking state court rulings in federal courts, even if they were not parties to the state court proceedings – particularly when they had an opportunity to participate in the state court litigation. See *S. Sherry, Judicial Federalism in the Trenches, the Rooker Feldman Doctrine in Action*, 74 Notre Dame L. Rev. 1085, 1113-1114 (May 1999) . . . . Therefore, this Court may have a jurisdictional basis to dismiss the Municipalities Service Agreement - related claims against the County, and the County's affirmative defenses based on the Service Agreements, since they are inextricably intertwined with the prior state court rulings."

If S.D. Warren had intended seriously to urge that we are required to apply the *Rooker-Feldman* doctrine here, we presume that the company would have presented its argument in rather less muted form. (The suggestion that we "may have a jurisdictional basis to dismiss" is hardly a ringing assertion of a jurisdictional defect.) Jurisdictional defects are not subject to waiver, however, so we are constrained to consider whether, under *Rooker-Feldman*, the district court lacked jurisdiction to approve the consent decrees and reject the

doctrines of res judicata, collateral estoppel and abstention."

All of the motions for intervention were granted, and the tendered pleadings were accepted for filing.

In December of 1997, acting at the request of the municipalities, the county gave notice of the termination of all service agreements – both those with the industrial companies and those with the municipalities – effective January 1, 2000. The companies promptly moved to dismiss the municipalities' claims on abstention grounds and on the ground that the termination of the service agreements rendered the claims non-justiciable. The court denied the motion.

During the first part of 1998 the county negotiated an "Amended Service Agreement" with the municipalities. The amended agreement – which, by its terms, was to "supercede all prior Service Agreements" – incorporated discharge regulations prescribed by a 1998 ordinance that was substantially identical to the 1994 ordinance enforcement of which had been enjoined in the state court litigation.

On July 13, 1998, the county and municipalities filed a joint motion for entry of a consent judgment ("the local consent decree") settling the municipalities' claims against the county. The proposed judgment incorporated the Amended Service Agreement (including the 1998 ordinance) and stated that the Agreement was to have "immediate and superseding force and effect over all previously executed Service Agreements, whether between the County and Local Units, or between the County and Service Agreement Industries."

On the day after the filing of the motion for entry of the local consent decree, the Michigan appellate court issued an unpublished opinion affirming the injunction against enforcement of the 1994 ordinance. In December of 1998, however, the district court issued an opinion and order granting the motion for entry of the local consent decree.

The companies then moved for partial summary judgment on their third affirmative defense. In that defense, the attentive reader will recall, the companies pleaded among other things that the relief sought by the United States "may breach and unconstitutionally impair preexisting contractual obligations of the County . . . ."

The district court heard oral argument on the motion, and in the course of the argument the United States moved for judgment in its favor on the contract issue. The district court subsequently entered an opinion and order granting the government's motion and denying the motion filed by the companies.

In the fullness of time the United States lodged with the court a proposed consent decree ("the federal consent decree") resolving the federal government's claims against the state and county on the basis of a payment of civil penalties in the amount of $160,000 and implementation of certain remedial actions. After publication of the proposed decree in the Federal Register, the United States moved to have the decree entered. For reasons stated orally on the record, the district court granted the motion. A timely notice of appeal followed.

II

A

In compliance with Rule 28(a)(4) and (5), Fed. R. App. P., the opening brief filed in this court by the appellant companies sets forth, under appropriate headings, a jurisdictional statement and a statement of the issues presented for review. Neither statement raises any question as to the district court's jurisdiction. In its description of the course of proceedings below, however, the companies' appellate brief includes a paragraph reading as follows:

"Shortly after intervening in the action, the Companies moved to dismiss the claims of the Municipalities from

the litigation based on [the] abstention doctrine in order to avoid investing duplicative and unnecessary judicial resources to evaluate contract claims already decided by the state courts. See *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). In its [sic] abstention argument, the Companies also directed the district court's attention to the 'Rooker/Feldman' doctrine as an alternative basis to dismiss the Municipalities' contract claims from the action based on jurisdictional grounds. This doctrine, set forth in the Supreme Court's decision in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), establishes that district courts have no jurisdiction to perform, in effect, appellate review of state court decisions. The Court denied the Companies' *Colorado River*-based abstention argument. The Companies have not appealed the abstention ruling. The district court did not address the jurisdictional issue raised in the Companies' abstention motion." (Record citations omitted.)[3]

The sentence last quoted from the brief on appeal is followed by a footnote that we quote substantially in full:

"This Court has wrestled with application of abstention principles and the jurisdictional Rooker/Feldman doctrine to claims like those presented by the Municipalities, who, although not parties to the state court action, collaterally attack the state court's judgment

---

[3]The alleged raising of "the jurisdictional issue" before the district court took the form of a sentence in the companies' brief on the abstention motion asserting that the purpose of the municipalities' intervention was one of "goading [the district court] into second guessing the state court and obtaining a judgment inconsistent with the state court's judgment . . . ." This sentence was followed by a relatively short footnote in which it was suggested that the *Rooker-Feldman* doctrine "provides [the district court] with an alternative basis to dismiss the Intervenor Plaintiffs' claims."