*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0266P (6th Cir.)
File Name: 04a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

J. RICHARD ERNST, WILLIAM
T. ERVIN, JAMES E. WILSON,
and JOHN PATRICK O'BRIEN,
on behalf of themselves and
all others similarly situated,
    *Plaintiffs-Appellants,*

    *v.*

DOUGLAS B. ROBERTS,
Treasurer of the State of
Michigan; CHRISTOPHER M.
DEROSE, Director,
Department of Management
and Budget Office of
Retirement Systems; GEORGE
M. ELWORTH, Member,
Michigan Judges Retirement
Board; ROY PENTILLA,
Member, Michigan Judges
Retirement Board; ERIC E.
DOSTER, Member, Michigan
Judges Retirement Board;
LYLE VAN HOUTEN, Member,
Michigan Judges Retirement
Board; and ROBERT RANSOM,

No. 02-2287

Member, Michigan Judges
Retirement Board,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-73738—Bernard A. Friedman, Chief District Judge.

Argued: January 30, 2004

Decided and Filed: August 12, 2004

Before: SUHRHEINRICH and CLAY, Circuit Judges;
GWIN, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Kenneth A. Flaska, KASIBORSKI, RONAYNE
& FLASKA, Detroit, Michigan, for Appellants. Wendell A.
Wilk, DYKEMA GOSSETT, Lansing, Michigan, for
Appellees. **ON BRIEF:** Kenneth A. Flaska, Chester E.
Kasiborski, Jr., KASIBORSKI, RONAYNE & FLASKA,
Detroit, Michigan, for Appellants. Wendell A. Wilk, Lori M.
Silsbury, DYKEMA GOSSETT, Lansing, Michigan, Larry F.
Brya, OFFICE OF THE ATTORNEY GENERAL, Lansing,
Michigan, for Appellees.

    CLAY, J., delivered the opinion of the court, in which
GWIN, D. J., joined. SUHRHEINRICH, J. (pp. 37-57),
delivered a separate dissenting opinion.

───────────────

[*] The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

---

### OPINION

---

CLAY, Circuit Judge. Plaintiffs, J. Richard Ernst, William T. Ervin, James E. Wilson, and John Patrick O'Brien, appeal from the order issued by the United States District Court for the Eastern District of Michigan, entered on September 30, 2002, granting the motion to dismiss of Defendants (Treasurer of the State of Michigan Douglas B. Roberts and affiliated parties), declining to exercise supplemental jurisdiction over Plaintiffs' state law claims, and denying as moot Defendants' motion for abstention or, alternatively, for a stay of proceedings, and Plaintiffs' motion to strike an affidavit, in this action under 42 U.S.C. § 1983, challenging the Michigan Judges Retirement Act of 1992, MICH. COMP. LAWS § 38.2101 *et seq.*, as violating the United States and Michigan Constitutions and also asserting state law claims for wasting trust and breach of fiduciary duty. For the reasons set forth below, we **REVERSE** the district court's dismissal of Plaintiffs' federal claims.

### BACKGROUND

#### *Procedural History*

On September 5, 2001, Plaintiffs filed a complaint, in which they alleged that the Michigan Judges Retirement Act of 1992, MICH. COMP. LAWS § 38.2101 *et seq.*, violates the Equal Protection Clauses of the United States and Michigan Constitutions and various provisions of state law. The complaint set forth ten counts. The initial eight counts of Plaintiffs' complaint alleged four separate theories of violation of equal protection. For each theory of the complaint, one count is devoted to federal law and another to state law. The final two counts of the complaint alleged violations of state law not related to equal protection, namely, wasting trust and breach of fiduciary duty.[1]

Plaintiffs sought various forms of relief. Plaintiffs sought certification of the action as a class action pursuant to FED. R. CIV. P. 23. Plaintiffs also sought restitution in the form of monetary awards. Additionally, Plaintiffs sought declaratory and injunctive relief, to alter the retirement system's functioning, for the purpose of bringing it into compliance with the laws whose violation Plaintiffs alleged.

The federal law counts relied upon 42 U.S.C. § 1983 as the basis for pleading the liability of Defendants (the Treasurer of the State of Michigan and affiliated parties), all of whom are government officials. On December 7, 2001, Defendants filed a Motion for Abstention or, Alternatively, for a Stay in the Proceedings. On December 18, 2001, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. On February 8, 2002, Plaintiffs filed a Motion to Strike the Affidavit of Daniel A. Norberg. On March 20, 2002, the district court held a hearing on Plaintiffs' motion to strike, Defendants' motions to dismiss or for summary judgment, and Defendants' motion for abstention or for a stay of proceedings.

On September 30, 2002, the district court entered an opinion and order, granting Defendants' motion to dismiss Plaintiffs' federal claims (Counts I, III, V, and VII) due to Defendants' Eleventh Amendment immunity; declining to exercise supplemental jurisdiction over Plaintiffs' state claims (Counts II, IV, VI, VIII, IX, and X); denying as moot Defendants' motion for abstention or for a stay of proceedings; and denying as moot Plaintiffs' motion to strike the Norberg affidavit. *Ernst v. Roberts*, 225 F. Supp. 2d 781,

---

[1] The district court opinion set forth the counts in detail. *Ernst v. Roberts*, 225 F. Supp. 2d 781, 784-85 (E.D. Mich. 2002).

789 (E.D. Mich. 2002).  Plaintiffs filed a timely notice of appeal.

### Substantive Facts

The district court stated the background facts that gave rise to this case as follows:

The plaintiffs in this case are a Michigan circuit judge, a Michigan probate judge, a Michigan district judge, and a retired Michigan circuit judge.  The case has not been certified as a class action, nor have plaintiffs moved yet for class certification.  Nonetheless, plaintiffs purport to represent all active and retired Michigan judges who are "similarly situated."    The basic allegation in the complaint is that the Judges Retirement Act of 1992 ("JRA"), which created the Judges Retirement System ("JRS"), treats judges of the 36th District Court more favorably than the "non-36th District Court judges." Plaintiffs claim that this disparity violates equal protection because there is no rational basis for providing judges of the 36th District Court more favorable pensions.

The defendants are:

-- Mark Murray[2], the Treasurer of the State of Michigan;

-- Christopher DeRose, the Director of the Office of Retirement Systems, which is part of the Michigan Department of Management and Budget. DeRose is also the executive secretary of the Judges Retirement System; and

---

[2]The treasurer at the time of the complaint, Mark A. Murray, was replaced by Douglas B. Roberts, who was substituted as a Defendant, by a district court order, on November 8, 2001.

-- George Elworth, Roy Pentilla, Eric Doster, Lyle Van Houten, and Robert Ransom, all of whom are members of the Michigan Judges Retirement Board ("MJRB").

Under the JRA, as amended in 1996, all Michigan judges are covered by one of two pension plans.  "Tier 1" is a defined benefit plan; "Tier 2" is a defined contribution plan.[3] Judges who first entered office before March 31, 1997, were in Tier 1. Judges who first entered office thereafter were in Tier 2. The 1996 amendment to the act permitted Tier 1 participants to move to Tier 2, but they had to make this election by a certain date in 1998.

*Ernst v. Roberts*, 225 F. Supp. 2d at 783-84.  More of a factual background is not needed, for purposes of this opinion, because the district court never reached the merits. As explained below, the district court's dismissal of the federal claims under the Eleventh Amendment constituted a dismissal for lack of jurisdiction.

### DISCUSSION

Plaintiffs make four arguments.  First, Plaintiffs claim that the district court erred in dismissing the federal claims on the basis of Eleventh Amendment immunity. Secondly, Plaintiffs argue that even if, *arguendo*, the federal claims were properly dismissed due to Eleventh Amendment immunity, the district

---

[3]These two types of plans differ as follows:

In a defined contribution plan "employees are not promised any particular level of benefits; instead they are promised only that they will receive the balance in their individual accounts." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637 n.1, 110 L. Ed. 2d 579, 110 S. Ct. 2668 (1990).  This is in contrast to a defined benefit plan which provides a fixed benefit to the employee. 29 U.S.C. § 1002(35).

*Bennett v. CONRAIL Matched Sav. Plan Admin. Comm.*, 168 F.3d 671, 675 n.2 (3d Cir. 1999).

court erred in dismissing the claims with prejudice. Thirdly, Plaintiffs aver that the district court erred by granting Defendants' motion to dismiss without identifying the precise rule upon which it relied and by ruling without affording Plaintiffs discovery regarding the Eleventh Amendment immunity defense. Finally, Plaintiffs argue that if Defendants are not entitled to Eleventh Amendment immunity, then the district court should be required to revisit the issue of assuming supplemental jurisdiction over Plaintiffs' state law claims.

Because we rule that Defendants are not entitled to Eleventh Amendment immunity on any of the claims, we decline to address Plaintiffs' second argument. We take the remaining three issues in order.

The first two issues that we address are reviewed *de novo*, because these issues address the ruling on Eleventh Amendment immunity. *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002).

## I.

Eleventh Amendment immunity bars federal courts from exercising jurisdiction[4] over a claim,[5] where the party

---

[4] Eleventh Amendment immunity is an issue of jurisdiction, but the issue is no longer classified as simply a question of subject matter jurisdiction. *Ku v. Tennessee*, 322 F.3d 431, 434 (6th Cir. 2003) ("by creating a clear rule of waiver by removal, the Supreme Court [in *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002)] has unequivocally rejected the view that, in cases over which the federal court otherwise has original jurisdiction, the additional 'jurisdictional bar' erected by the Eleventh Amendment should be treated as a matter of 'subject matter' jurisdiction rather than 'personal' jurisdiction.").

[5] Eleventh Amendment analysis must be done on a claim-by-claim basis. *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 338 (6th Cir. 1990).

---

asserting immunity establishes that immunity applies.[6] In burden allocation, as well as in other respects, Eleventh Amendment immunity may be considered to be an affirmative defense to jurisdiction.[7]

Plaintiffs argue that Eleventh Amendment immunity does not bar the federal claims in this case. The Eleventh Amendment bars suits against a state by citizens of another state, and, under *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890), the Eleventh Amendment prohibits citizens from suing their own state. *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002) (citing *Hans*).

When a state or an arm of the state is sued, there are various exceptions to immunity;[8] but none of these exceptions fully

---

[6] The party asserting Eleventh Amendment immunity bears the burden of establishing it. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002).

[7] *Higgins v. Mississippi*, 217 F.3d 951, 953 (7th Cir. 2000) (characterizing Eleventh Amendment immunity as "an affirmative defense rather than a limitation on jurisdiction.").

Generally, the party asserting jurisdiction has the burden of establishing it. *E.g., Hudson v. Coleman*, 347 F.3d 138, 141 (6th Cir. 2003). The difference between Eleventh Amendment immunity and other jurisdictional issues, in this respect, supports the view of the immunity as an affirmative defense to jurisdiction.

There is further support for the characterization as an affirmative defense in the fact that Eleventh Amendment immunity can be waived by the state or agency (*see infra* note 8), while original jurisdiction cannot be waived. *E.g., United States v. County of Muskegon*, 298 F.3d 569, 579 (6th Cir. 2002).

The notion of this immunity as an affirmative defense to jurisdiction helps to explain its differences from other issues of jurisdiction. *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 338 (6th Cir. 1990) ("the atypical jurisdictional bar of the eleventh amendment").

[8] Even if the party being sued is a state or an arm of the state, Eleventh Amendment immunity will not apply to a claim, under various circumstances.

governs the present case. Contrary to the dissent's characterization of our holding,[9] we do not rule that the state has waived its immunity to suit. The dissent emphasizes that a waiver of state court immunity does not constitute a waiver of immunity to suit in federal court. This proposition is perfectly true and equally irrelevant. Our holding is not that the state has waived immunity to suit against the JRS; rather, for the reasons stated below, we hold that the JRS is akin to a political subdivision (and not an arm of the state), which means that immunity never applied. Because immunity never applied, it was not waived.

Under *Ex Parte Young*, there is no immunity for a claim for only prospective, non-monetary relief. *See supra* note 8. Various federal claims in this case clearly seek monetary relief, including the refund and payment of portions of Plaintiffs' contributions to the JRS. Because we hold that none of the claims for monetary relief are covered by Eleventh Amendment immunity, we need not reach the issue of whether there are any federal claims seeking only prospective, non-monetary relief. The dissent has gone to

---

Immunity may be waived by the state or agency. *Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002); *Lawson v. Shelby County*, 211 F.3d 331, 334 (6th Cir. 2000); *Nelson v. Miller*, 170 F.3d 641, 646 (6th Cir. 1999).

Immunity may be waived by Congress. *Nelson v. Miller*, 170 F.3d at 646; *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).

There will be no immunity if the claim challenges the constitutionality of actions against state officials and seeks only prospective, non-monetary damages, such as an injunction. *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002) (citing *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974) and *Ex Parte Young*, 209 U.S. 123, 150-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908)); *Nelson v. Miller*, 170 F.3d at 646.

[9]The dissent states, "In fact, on the flip side, the Supreme Court has consistently held that a state does not waive its Eleventh Amendment immunity by *consenting* to suit only in its own courts." (Emphasis in original.)

great pains to emphasize that monetary relief is sought. But, as explained below, the question of Eleventh Amendment immunity hinges on whether or not the state would potentially be liable for a judgment in the case; hence, the fact that monetary relief is sought is not determinative–rather, the key question is where the monetary relief would come from, if a judgment were entered. (The dissent rightfully acknowledges this point, stating, "To rephrase the issue a bit: by providing the requested relief, would we be ordering prospective injunctive relief, or monetary damages? And if the latter, where would the money come from?")

The dispute as to jurisdiction in the present case arises due to the fact that the Eleventh Amendment does not bar all suits against non-federal public agencies. The Eleventh Amendment does not apply to political subdivisions, such as municipalities. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). As stated in *Hall v. Medical College of Ohio*,

> When an action is brought against a public agency or institution, and/or the officials thereof, the application of the Eleventh Amendment turns on whether said agency or institution can be characterized as an arm or alter ego of the state, or whether it should be treated instead as a political subdivision of the state.

742 F.2d 299, 301 (6th Cir. 1984) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)). The question before us is whether the JRS is identifiable as an arm or alter ego of the state, as is necessary for the JRS and its agents[10] to be

---

[10]"In addition to the states themselves, the Eleventh Amendment immunizes departments and agencies of the states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)." *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 615 (6th Cir. 2003).

When sued in their official capacities, individual defendants enjoy immunity if they are officials of a state agency that would enjoy

covered by Eleventh Amendment immunity, or whether, to the contrary, the JRS is better deemed a political subdivision, akin to a municipality.

State law is crucial to the analysis, because state law defines the nature of agencies.  In *Mount Healthy City School District Board of Education v. Doyle*, the Supreme Court made clear that state law plays a role in determining whether an agency is more akin to a municipality or to an arm of the state:

> The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.  The answer depends, at least in part, upon the nature of the entity created by state law.

429 U.S. 274, 280 (1977), *superseded on other grounds by statute*, by 5 U.S.C. § 1221(e)(2).  In accordance with this principle, in *Blake v. Kline*, 612 F.2d 718 (3d Cir. 1979), state law was vital to the analysis of a state treasury's potential legal liability.  The Third Circuit stated that once Pennsylvania made a contribution to a retirement plan, the funds contributed might no longer be general state funds, under Pennsylvania law.  *Id.* at 724, 728 (remanding for further inquiry into state law).

---

immunity.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (stating, regarding a claim against an individual state official, pursuant to 42 U.S.C. § 1983, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.") (citations omitted).  *See also Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 301 (6th Cir. 1984).

Citing *Blake*, this Court determined that Eleventh Amendment immunity barred suit against the Medical College of Ohio at Toledo ("MCO"), in part due to the definition of this entity under state law; in explaining the decision, this Court explicitly emphasized the importance of state law, which can be controlling, in Eleventh Amendment analysis:

> Although we can find no reported decision, federal or state, dealing specifically with the status of MCO, it is highly significant that the statute which created and governs the University of Cincinnati as a state university is virtually identical in its terms to the statute which created and governs the Medical College of Ohio.  *See* Ohio Rev. Code Ann. §§ 3361.01-.05 (Page 1980).  It would therefore  appear that Ohio considers MCO an "arm of the state," and not merely a political subdivision thereof.  The question of its status for purposes of the Eleventh Amendment is, of course, a matter of federal, not state, law, but Ohio decisions and laws shedding light on the relationship of the school to the state government are important, and potentially controlling.  *See Blake v. Kline*, 612 F.2d at 722, *see also Hughes-Bechtol, Inc. v. West Virginia Board of Regents*, 737 F.2d 540, slip at 5 (6th Cir. 1984); *Long v. Richardson*, 525 F.2d at 75, 79.

*Hall*, 742 F.2d at 303-04.  The law of this Circuit is so clear in emphasizing the importance of state law in questions of Eleventh Amendment immunity that another circuit has cited our Circuit on this issue.  *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 439 (5th Cir. 1985) ("the . . . Sixth Circuit[] ha[s] held that although the question of Eleventh Amendment immunity is a matter of federal law, state decisions concerning the relationship of the entity to the state may be an important, and under certain circumstances a controlling  factor  in  determining  immunity  under  the Eleventh Amendment.") (citing *Hall*, 742 F.2d at 302; internal quotation marks omitted).

The dissent misconstrues the law, here, by failing to recognize the significant role that state law plays in the analysis. The dissent states, "If the state treasury is immune from liability . . . , it is because of the Eleventh Amendment and not Article IX, § 24 of the Michigan Constitution or the *Musselman* decision." Apparently, in the dissent's view, the Eleventh Amendment provides this Court the basis for determining whether a non-federal public agency is akin to an arm of a state or is akin to a municipality. The dissent would have us consult the Eleventh Amendment to determine whether or not the Michigan state treasury could potentially be held liable for a judgment against the JRS. This reasoning overlooks this Court's pronouncement that in employing Eleventh Amendment analysis to determine whether an entity is akin to an arm of the state or is akin to a municipality, state statutes and state court decisions "are important, and potentially controlling." *Hall*, 742 F.2d at 303-04.

The general question of how to characterize a non-federal public entity has not been left to federal courts' whim or intuition. Rather, under established case law, in Eleventh Amendment analysis, the question of whether a public entity is best characterized as an arm or alter ego of the state, instead of being deemed a political subdivision of the state, hinges on whether there is potential legal liability of the state treasury to satisfy a judgment. If a claim against a public agency exposes the state treasury to potential legal liability, then Eleventh Amendment immunity bars the claim from being heard in federal court; if there is no such potential liability, then there is no immunity. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997) ("[I]t is the [state] entity's potential legal liability for judgments, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant in determining the underlying Eleventh Amendment question."); *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 615 (6th Cir. 2003) ("To determine whether an entity is a state department or agency for purposes of the Eleventh Amendment, the primary issue is whether the state would

ultimately be liable for any money judgment against the entity. *Brotherton v. Cleveland*, 173 F.3d 552, 560-61 (6th Cir. 1999)."); *Brotherton v. Cleveland*, 173 F.3d 552, 561 (6th Cir. 1999) ("The *Hess* [*v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994)] opinion focused on the impact on a State treasury, and [*Regents of the University of California v.*] *Doe* slightly altered that emphasis by establishing that potential liability, not actual ability to pay or indemnification, determines the Eleventh Amendment status of an entity. *See Doe*, 117 S. Ct. at 904-05."). *See also Alkire v. Irving*, 330 F.3d 802, 812 (6th Cir. 2003) ("*Hess*'s emphasis on the State treasury").

Prior to *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994), potential state treasury liability was only one of a number of factors in the Eleventh Amendment analysis. The other factors included the entity's status under state law; whether the entity performs a governmental or proprietary function; whether the entity has been separately incorporated; the degree of autonomy that the entity exercises over its own operations; whether the entity can sue or be sued and enter into contracts; immunity from state taxation; and whether the sovereign has immunized itself from responsibility for the entity's operations. *Hall*, 742 F.2d at 302 (quoting *Blake v. Kline*).

But *Hess* enhanced the importance of state treasury liability, to the extent that, after *Hess*, the possibility arose that other factors (aside from state treasury liability) can no longer be considered at all. In *Brotherton v. Cleveland*, we were able to reach a ruling without determining whether *Hess* had eliminated any consideration of the other factors, and we explicitly left this question unresolved. 173 F.3d at 561 ("Whether we view as dispositive *Hess*'s emphasis on the State treasury, or interpret it as placing significant weight on one factor of a multi-factor test, we conclude that EBAA may not properly invoke the Eleventh Amendment.") (citation omitted).

In *Dubuc*, we dealt with the question of whether the other factors (aside from state treasury liability) survived *Hess* in any form. We ruled that when no evidence is presented regarding the issue of whether the funds to satisfy a judgment would come from the state treasury, the other factors may be considered. 342 F.3d at 615 ("The parties have not submitted any evidence regarding whether the State of Michigan would be ultimately responsible for any money judgment against the Board or the Bar. The other factors, however, weigh in favor of finding the Board and the Bar immune from this lawsuit."). However, in *Dubuc* and in *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003), we reiterated our statement from *Brotherton* that, after *Hess*, it is unclear whether other factors may even be considered when evidence is presented regarding the whether the state treasury would be liable for a judgment. *Dubuc*, 342 F.3d at 615 (citing *Brotherton*); *Alkire*, 330 F.3d at 811-12 (citing *Brotherton*).

Our cases uniformly make clear that, even if the other factors can be considered, still, the most significant factor is potential liability of the state treasury. *Alkire*, 330 F.3d at 811 ("we now recognize that the question of who pays a damage judgment against an entity as the most important factor in arm-of-the-state analysis, though it is unclear whether it is the only factor or merely the principal one.") (citing *Brotherton*).

In light of the statements in *Brotherton*, *Alkire*, and *Dubuc*, indicating that *Hess* may have completely eliminated any consideration of the other factors, we reiterate the position taken in those cases: potential liability of the state treasury is the most important factor, and the other factors may have been rendered completely obsolete by *Hess*. This could mean that the other factors are of no significance, unless (as in *Dubuc*) there is not sufficient evidence or legal authority to support a conclusion as to state treasury liability. Arguably, there is also the possibility that other factors could also prove significant in cases in which there is sufficient evidence and legal authority to support a conclusion as to potential state treasury liability, but all or almost all of the other factors were

to clearly point towards the opposite conclusion of that reached as to state treasury liability. For example, in cases in which it appeared that there were no potential state treasury liability, but all or almost all of the other factors clearly indicated that the agency was akin to an arm of the state, perhaps immunity would apply.

But we need not determine which interpretation of the role of the other factors is correct, because in the present case it is undisputed that there is sufficient evidence and legal authority to support a conclusion as to state treasury liability,[11] and the other factors do not align together to counter the state treasury liability analysis. Quite a few of the other factors (apart from potential liability of the state treasury) support the view that the JRS is akin to a municipality. The JRS's function is more aptly characterized as proprietary than as governmental, because the JRS's function is for the profit or material benefit of itself (and its beneficiaries), and not the general public.[12] The JRS enjoys a fair degree of autonomy. *E.g.*, MICH. COMP. LAWS § 38.2204(1) ("The retirement board has the rights, authority, and discretion in the proper discharge of retirement board duties pursuant to the executive organization act of 1965, Act No. 380 of the Public Acts of 1965, being sections 16.101 to 16.608 of the Michigan Compiled Laws."). It is undisputed that the JRS can sue and be sued in state

---

[11]The dissent reaches a different conclusion from ours, as to potential state treasury liability, but there is no dispute that we have sufficient evidence and legal authority to decide the issue. *Cf. Dubuc*, 342 F.3d at 615.

[12]According to BLACK'S LAW DICTIONARY (7th ed. 1999), a "governmental function" is the legally authorized conduct of a government agency "that is carried out for the benefit of the general public." *Id.* at 704. A "proprietary function" is "[a] municipality's conduct that is performed for the profit or benefit of the municipality rather than for the benefit of the general public." *Id.* at 1235.

court.[13] The JRS can enter into contracts: the JRS has the statutory authority to enter into contracts with private individuals or corporations; this authority has been exercised, e.g., to retain actuarial services;[14] also, the JRS enters into contracts with the state, from whom the JRS leases office space and purchases legal, administrative, and investment services.[15]

To be sure, certain of the remaining factors favor the view of the JRS as an arm of the state; for example, it is undisputed that the JRS is not separately incorporated. But we express no definitive view as to the remaining other factors, because, even if they all weighed in favor of Defendants' position, they would not be sufficient to change the analysis. In light of the numerous factors enumerated above, which indicate that the JRS is akin to a municipality, and in light of our analysis of potential state treasury liability below, reaching the same

---

[13]In a state court action alleging discrimination on much the same basis that discrimination is alleged in the present action, the JRS was named as the defendant. The matter was contested on the merits. It was undisputed that the JRS could be sued in state court. (J.A. at 312.)

The dissent somehow misses this point, stating, in its footnote 16, "This leads to a curious result: although the state cannot be sued in state court because it has exercised its sovereign immunity, it can be sued in federal court because it cannot be sued in state court." The dissent conflates the JRS with the state. It is undisputed that the JRS can be sued in state court.

[14]MICH. COMP. LAWS § 38.2205 ("The department shall be responsible for the budgeting, procurement, and related management functions of the retirement system. The director of the bureau of retirement systems in the department is the executive secretary of the retirement system. The executive secretary, with department approval, shall employ the services of an actuary and, subject to rules of the civil service commission, shall employ medical advisers, clerical, technical, and administrative employees the executive secretary considers necessary for the proper operation of the retirement system."); (J.A. 316) (JRS budget).

[15]The payments for these services are substantial. *See infra* note 17.

conclusion, the other remaining factors could not possibly sway our conclusion that there is no Eleventh Amendment immunity.

Thus, we proceed to the analysis of the key factor, potential legal liability of the state treasury for a judgement. Theoretically, there are two ways in which potential legal liability for a judgment against the JRS might reach state treasury funds. First, JRS funds might be commingled with general state funds–which is to say that JRS funds might be available for general use by the state for other purposes, unrelated to the retirement system. If funds are commingled, then any JRS liability would be tantamount to state treasury liability. Secondly, even if JRS funds are segregated from state treasury funds, the JRS might not have sufficient funds to satisfy a judgment; applicable state law could make state treasury funds available to satisfy the part of the judgment that exceeded the amount of funds available to the JRS. We examine both possibilities.

### A.  Whether JRS Funds Are Segregated from State Treasury Funds

The first question is whether JRS funds are commingled with general state funds. If the JRS's funds are not separate from the state treasury, then any judgment against the JRS would necessarily impose liability on the state treasury.

Defendants argue that Michigan law makes retirement funds general state funds. Defendants cite the Michigan Constitution, Art. IX, § 19, which specifies, "The state shall not subscribe to, nor be interested in the stock of any company, association or corporation, except as follows: (A) Funds accumulated to provide retirement or pension benefits for public officials and employees may be invested as provided by law." Defendants argue, "If the retirement funds were not considered State funds, there would be no need for the framers to carve out this exception." (Defendants' Br. at 20 n.9.) However, this argument is one of

semantics. The use of the term "state" in Art. IX, § 19 of the Michigan Constitution does not establish that JRS funds are state funds, under Eleventh Amendment analysis. Eleventh Amendment analysis hinges upon potential state treasury liability–Defendants' argument here does not bear on this issue.

Other sources of law make clear that JRS funds are segregated from the state treasury. This means that relief for Plaintiffs' claims would not come from general state funds but, rather, from the trust devoted solely to the JRS. As stated in MICH. COMP. LAWS § 38.2604(6):

> The assets of the retirement system shall be held in trust and invested for the sole purpose of meeting the legitimate obligations of the retirement system and shall not be used for any other purpose. The assets shall not be used for or diverted to a purpose other than for the exclusive benefit of the members, vested former members, retirants, and retirement allowance beneficiaries before satisfaction of all retirement system liabilities.

*See also* MICH. COMP. LAWS § 38.2208 (stating that retirement payments are "payable out of funds of the retirement system").

It is true that some of the funds in the JRS are contributed by the state. Part of the JRS comes from contributions from the public employees themselves (such as Plaintiffs). As Plaintiffs state, "Any judgment for Plaintiffs . . . might require a refund to Plaintiffs of contributions illegally extracted from them . . . ." (Plaintiffs' Br. at 23.) The remainder of the JRS comes from annual state contributions, under MICH. COMP. LAWS § 38.2302. *See Ernst v. Roberts*, 225 F. Supp. 2d at 789 ("Part of the relief plaintiffs are seeking in this case is a refund of the allegedly overfunded Tier 1 plan which, they concede, *includes* 'the State's mandatory contribution to the Tier 1 Plan.'") (emphasis added).

However, the dissent mischaracterizes the significance of the state contributions to the JRS, under MICH. COMP. LAWS § 38.2302. The presence of funds contributed by the state is simply the scenario described in *Blake*–after the state funds are contributed to the retirement plan, "that money loses its identity as [general state] funds and becomes trusteed funds earmarked for a particular purpose." 612 F.2d at 724. State law specifies with clarity[16] that JRS funds are kept in a separate trust from general state funds; thus, funds taken from the JRS to satisfy a judgment would not be funds from the state treasury. In other words, once general state funds (from the state treasury) are contributed to the JRS, the funds become specifically earmarked for JRS use and cannot be used for any other purpose; JRS funds cease to constitute general state funds. MICH. COMP. LAWS § 38.2604(6). Hence, a judgment against the JRS does not impose liability on the state treasury.

Indeed, not only is state law clear on this matter; also, the record before us helps to confirm our conclusion. The JRS makes arms length payments to the state, for office rental space and services rendered.[17] The existence of these payments from the JRS to the state again suggests that the funds of these two entities were not commingled; the detailed accounting of the payments further supports the notion that funds were not commingled.

---

[16] In *Blake*, the Pennsylvania Attorney General advanced the notion that under Pennsylvania law the retirement funds become segregated. 612 F.2d at 724. The Pennsylvania Attorney General did not cite any state law supporting this view, and thus further inquiry was needed. Consequently, the case was remanded to the district court, with the Third Circuit vacating district court's order dismissing the complaint as barred by the Eleventh Amendment. *Id.* at 728.

[17] In 2000, the JRS paid to the state $1211 in building rentals; $8096 in technological support; $38,224 in fees to the Attorney General; and $65,000 for investment services. In 1999, the corresponding figures were $1183, $16,379, $3776, and $63,600, respectively. (J.A. at 307.)

## B. Whether State Treasury Funds Might Be Called Upon, if the JRS Lacked Sufficient Funds to Satisfy a Judgment

Even where, as here, the agency's funds are segregated from the state treasury, there remains the possibility that a monetary judgment would exceed the current amount of funds held by the agency and that such a judgment could reach the state treasury. We must determine whether, under state law, if there were a judgment against the JRS that exceeded the JRS's current level of funds, the State of Michigan could possibly be compelled to use state treasury funds to satisfy the remainder of the judgment.

In determining "potential legal liability," we do not consider the actual level of funding of the JRS. It is irrelevant whether the JRS actually has enough funds to satisfy the amount sought in any judgment. *Brotherton*, 173 F.3d at 561 ("The *Hess* opinion focused on the impact on a State treasury, and [*Regents of the University of California v.*] *Doe* slightly altered that emphasis by establishing that potential liability, *not actual ability to pay* or indemnification, determines the Eleventh Amendment status of an entity. *See Doe*, 117 S. Ct. at 904-05.") (emphasis added). Rather, the relevant question is whether the state could be legally obligated to pay part of a judgment, under the hypothetical scenario in which the funds of the separate agency (in this case, the JRS) were not sufficient to satisfy the judgment. For the purposes of this hypothetical inquiry, we must assume that the amount of liability imposed by a judgment would exceed the agency's current level of funds; we then ask whether the state treasury could be held liable for the remainder of the judgment. If, under our hypothetical inquiry, the state treasury could be liable for a judgment on a claim, then that claim is barred by Eleventh Amendment immunity–there is *potential* legal liability, notwithstanding that the probability of the state

treasury being forced to actually pay part of a judgment may be quite low.[18]

Defendants allege that a legal obligation, creating state treasury liability, arises from Art. IX, § 24 of the Michigan Constitution, which states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

Yet there is no potential legal liability of the state treasury if there cannot be a legal action to compel the state to divert funds from the state treasury to satisfy a judgment that exceeds the JRS's funds. Legal liability exists only when some legal action can be brought to enforce a legal duty.[19] The case of *Musselman v. Governor of Michigan*, 533 N.W.2d 237, 448 Mich. 503 (1995) establishes that Art. IX, § 24 does not create any right of action that could force state

---

[18]It is not clear whether a court may ever separate a claim into the portion that could be satisfied by segregated agency funds and the excess portion that might reach the state treasury–essentially, Plaintiffs have suggested such a scenario, through an offered stipulation. Whether a plaintiff can separate a claim in this manner is a question that we need not decide in this case.

[19]"Liability" is universally defined to include a mechanism to compel enforcement. *See*, *e.g.*, BLACK'S LAW DICTIONARY 925 (7th ed. 1999) ("liability" is "[t]he quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1302 (1993) (defining "liability," *inter alia*, as "accountability and responsibility to another enforceable by legal civil or criminal sanctions").

treasury funds to be used to pay any part of a judgment against the JRS. In *Musselman*, the Michigan legislature did not appropriate money for health benefits earned by current employees. 533 N.W.2d at 239-40, 448 Mich. at 507-08. The plaintiffs alleged that the legislature's action violated Art. IX, § 24. 533 N.W.2d at 240, 448 Mich. at 509-10. Yet, in denying mandamus, the Supreme Court of Michigan explained that there could be no legal action to enforce the "shall be funded" provision of Art. IX, § 24:

> Given that the plaintiffs have failed to show that there is a pool of funds available to be transferred to the reserve for health benefits, the requested relief necessarily involves funds from the state treasury. The only defendant with authority to appropriate funds from the treasury is the Legislature. *See Board of Education of the City of Detroit v. Elliott*, 319 Mich. 436, 453; 29 N.W.2d 902 (1947). "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." Const. 1963, art. 9, § 17.

> In this context, this Court lacks the power to require the Legislature to appropriate funds. This was the understanding of the drafters of art. 9, § 24, who likewise did not contemplate that the prefunding requirement could be enforced by a court. They expected that the decision to comply rested ultimately with the Legislature, whom the people would have to trust:

>> It is the intention that we will put in each year enough in every fund to take care of the liability occurring during that year, so it will not go farther and farther behind.

>> . . . [But] there is no way to compel the legislature to appropriate money. There is no way that I know of to compel a city council to raise more money. We have to put some faith in somebody, and this is being put in the legislature. [1 Official Record,

>> Constitutional Convention of 1961, p. 773 (delegate Brake).]

> In other words, insofar as the plaintiffs are asking us to require the Legislature to appropriate funds for retirement health care benefits, we understand that the intention of the drafters was that the second sentence of Const. 1963, art. 9, § 24 is not self-executing. Because the provision does not alter the rule that legislative action is necessary to appropriate funds, it fails to lay down rules by means of which its principles may be given the force of law.

533 N.W.2d at 245-46, 448 Mich. at 522-23 (footnotes and internal quotation marks and brackets omitted).

The Supreme Court of Michigan explained that the purpose of Art. IX, § 24 was to prevent the legislature from borrowing from the accrued assets of plan participants. 533 N.W.2d at 241-42, 448 Mich. at 511-12. Such borrowing, or "back door" spending, as it was called, could create situations in which the liabilities of a public retirement system far surpassed the system's assets. *Id.* Yet even where this purpose was being circumvented–as in *Musselman*, where current health care benefits were not being funded–the legislature could not be legally compelled to devote state treasury funds to fund the benefits. 533 N.W.2d at 242, 448 Mich. at 522 ("the drafters of art 9, § 24 . . . did not contemplate that the prefunding requirement could be enforced by a court."). The state treasury cannot be held legally liable, even where the very purpose of Art. IX, § 24 is at stake.

Under *Musselman,* a legal action cannot be maintained in state court, in Michigan, to compel the state to devote state treasury funds to fulfill the mandate of Art. IX, § 24. Nor could Art. IX, § 24 provide the basis for any subsequent legal action in federal court to compel state treasury funds to be devoted to fulfilling a judgment in a lawsuit. As stated in

*Musselman*, "[t]he only defendant with authority to appropriate funds from the treasury is the Legislature." 533 N.W.2d at 245-46, 448 Mich. at 522. Needless to say, where there cannot be a legal action to enforce the Michigan Constitution against the state treasury, there could be no action to enforce a state statute, such as MICH. COMP. LAWS § 38.2302, against the treasury. The Eleventh Amendment bars any action against the state legislature, which, unlike the JRS, could never be considered a political subdivision akin to a municipality but, rather, would always be identified as a branch of the state itself.[20] There can be no action in any court to force the state treasury to pay any part of a judgment relating to a federal claim in a lawsuit concerning the JRS–thus, the state treasury is not subject to potential legal liability. Even if the JRS lacked sufficient funds to satisfy a judgment in this case, the state treasury could not be held liable for any unpaid portion of the judgment.

---

[20]The liability analysis regarding the JRS would not apply to the state legislature.

The JRS is a state-created public agency that performs a function within the narrow area of retirement benefits. Thus, potential legal liability analysis applies to determine whether the JRS is more akin to a municipality than an arm or alter ego of the state. But this analysis only applies to specialized state entities, such as agencies that perform administrative functions within narrow areas.

The state legislature is not specialized in one particular area but a constitutionally authorized branch of state government. MICH. CONST. art. IV, § 1. The state legislature is by definition an arm of the state, not an agency. Of course, this distinction is ultimately moot. Even if, *arguendo*, the state legislature were subject to potential liability analysis, immunity would apply. A federal monetary judgment for a claim against the state legislature would be interpreted as attempting to compel the legislature to use its authority to appropriate state treasury funds to satisfy the judgment. The claim would thus be barred by the Eleventh Amendment, under potential legal liability analysis.

In a legal action, rights and remedies are separate elements.[21] "[W]here there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (quoting BLACKSTONE'S COMMENTARIES). However, the scope of remedies for a legal right is not unlimited. *Musselman* did not rule out the possibility of injunctive relief to enforce Art. IX, § 24. For instance, if the state attempted to divert JRS funds to finance state liabilities unrelated to the JRS, then presumably Art. IX, § 24 would provide grounds for injunctive relief, independent of any rights established in MICH. COMP. LAWS § 38.2604(6).[22] *Musselman* simply made clear that there can be no monetary relief from the state

---

[21]As stated in a scholarly commentary:

The scope of a cause of action . . . flows from the primary right theory that every judicial action consists of the following elements: (1) a primary right which is possessed by the plaintiff and a corresponding primary duty owed by the defendant; (2) a wrong done by the defendant which consists of a breach of the primary right and duty; (3) remedial right of the plaintiff and a remedial duty of the defendant; (4) a remedy or relief.

Elizabeth L. Hisserich, Comment, *The Collision of Declaratory Judgments and Res Judicata*, 48 UCLA L. REV. 159, 165-66 (2000) (footnotes omitted). *See also* Dorothy M. Robins, Comment, *When the Gleam in Your Eye Becomes A Glare: Capped Damages in Fertility Malpractice Actions*, 26 U.S.F. L. REV. 717, 751 n.66 (1992) ("Every judicial action must . . . involve the following elements: a primary right possessed by the plaintiff, and a corresponding primary duty devolving upon the defendant; a delict or wrong done by the defendant which consisted in a breach of such primary right and duty; a remedial right in favor of the plaintiff, and a remedial duty resting on the defendant springing from this delict, and finally the remedy or relief itself.") (citations omitted).

[22]An injunction would enforce Art. IX, § 24's provision that "[f]inancial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

treasury; the case did not rule out the possibility of a non-monetary remedy.

Absent the *Musselman* case, it might have been argued that the state treasury could have been held liable pursuant to Art. IX, § 24. Governmental actors have been held liable for damages based on rights granted in a constitution, even where no statute explicitly authorizes such damages. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (establishing monetary liability of federal officials for violations of the Fourth Amendment[23]). Thus, absent a clear statement of law to the contrary, we would have to hold that Art. IX, § 24 creates potential state treasury liability. But *Musselman* clearly holds that there is no potential state treasury liability. Consequently, none of the claims are barred by Eleventh Amendment immunity.

The dissent's counter-arguments prove unpersuasive. The dissent states that "any funding requirement, even if it must be honored by the legislature and not ordered by a court, will necessarily impact on the state treasury." However, an "impact" on the state treasury–resulting from the legislature's *voluntary* decision to appropriate funds to make up for a possible depletion in an agency's funds–is not akin to "liability." The cases cited by the dissent in support of its proposition[24] pre-date the Supreme Court's adoption of the term "potential legal liability" in *Doe*, which was decided in 1997. 519 U.S. at 431. The term "liability" has a precise meaning (discussed above). We have no reason to believe that the Supreme Court used this term heedlessly. As a result

---

[23]At the time that *Bivens* was decided, 42 U.S.C. § 1983 had already established that state officials may be held liable for damages for violations of the federal constitution. But this statute did not provide a basis for establishing the liability of federal officials for violations of the federal constitution. *Bivens*, 403 U.S. at 399 n.1 (Harlan, J., concurring).

[24]*Edelman v. Jordan*, 415 U.S. 651 (1974); *Fitzpatrick v. Bitzer*, 519 F.2d 559 (2d Cir. 1975), *rev'd on other grounds*, 427 U.S. 445 (1976).

of the Supreme Court's holding in *Doe*, this Court has repeatedly referred to the term "liability" in characterizing the legal standard that governs immunity analysis. *Dubuc*, 342 F.3d at 615 ("To determine whether an entity is a state department or agency for purposes of the Eleventh Amendment, the primary issue is whether the state would ultimately be liable for any money judgment against the entity.") (citing *Brotherton*); *Brotherton*, 173 F.3d at 561 ("The *Hess* opinion focused on the impact on a State treasury, and *Doe* slightly altered that emphasis by establishing that potential liability, not actual ability to pay or indemnification, determines the Eleventh Amendment status of an entity.") (citing *Doe*).

The dissent states that the majority's "reasoning is faulty because a state's exercise of state sovereign immunity does not control the question of federal constitutional immunity." Indeed, the dissent repeatedly characterizes Michigan as exercising "state sovereign immunity." However, the dissent is mistaken, here. The state has not immunized the JRS from suit in state court; to the contrary, the JRS has been named as the defendant in an action in state court that was adjudicated on the merits. *See supra* note 13. Nor does it appear that there would be state court immunity for any of the state officials who are named as Defendants in this case. *See Marrical v. Detroit News, Inc.*, 805 F.2d 169, 173 (6th Cir. 1986) ("We initially note that the Michigan legislature, when it enacted its governmental immunity statute, declined to extend immunity to governmental officials and contemplated that they would be subject to suit for torts committed in the course of their duties.").

The *Musselman* case had nothing to do with state court immunity. Immunity is a defense, where a suit could otherwise be brought (absent the immunity). *E.g., Cartwright v. City of Marine City*, 336 F.3d 487, 490 (6th Cir. 2003) ("Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.") (citation and internal quotation marks omitted); *see also supra* note 7. *Musselman* held that there never had been any mechanism for bringing a suit in state court to enforce Art. IX, § 24 against the state treasury. Thus, under *Musselman*'s holding, it would be superfluous, even meaningless, to speak of immunizing the state treasury from suit in state court to enforce Art. IX, § 24. Immunity applies as a defense only where, contrary to the situation here, there is an existing means for bringing a suit.

Nothing in our ruling would prevent a state from exercising state sovereign immunity for its agencies. The state could prohibit suit in state court against any of its agencies. Where a judgment against an agency would potentially impose liability on the state treasury, the agency would be immune from suit in federal court; the agency could also be immune from suit in state court. Where a judgment against an agency could not potentially impose liability on the state treasury, the agency could be immune from suit in state court but not in federal court. Our ruling in no way impedes states from implementing state court immunity for agencies.

The dissent quotes from *Dubuc*, 342 F.3d at 617, which states, "[w]hile [a provision of the Michigan Supreme Court Rules Concerning the State Bar of Michigan providing the staff of the State Bar and the Board of Law Examiners] may immunize the individual defendants from state law claims, no state law or rule can immunize anyone from liability for violating the United States Constitution." The dissent selectively ignores the phrase "individual defendants." In *Dubuc*, this Court simply made clear that a state cannot invoke federal immunity for individual state officials who violate the federal constitution, because the act of violating the constitution strips the individuals of their status as state officials:

In *Ex parte Young*, the Supreme Court explained the supremacy of federal law over state law:

> If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

209 U.S. 123, 159-60, 52 L. Ed. 714, 28 S. Ct. 441 (1908).

*Dubuc*, 342 F.3d at 617. This reasoning is inapposite here, because the state treasury would not be stripped of its public character, if a judgment rendered the JRS liable for violations of the federal constitution. The phrase "individual defendants" is not used carelessly in the passage quoted by the dissent. The state treasurer would liable for a judgment in this case, but (per *Musselman*) only insofar as he could satisfy that judgment with funds from the JRS. The Eleventh Amendment is necessary to protect the state treasury precisely because, unlike an individual defendant, the state treasury cannot possibly be stripped of its identity as part of the state.

Under the dissent's misreading of *Dubuc*, municipalities would enjoy sovereign immunity: state laws and rules create and define municipalities, but "no state law or rule can immunize anyone from liability for violating the United States Constitution." In essence, the dissent would attempt to contradict the Supreme Court's clear ruling that municipalities are not entitled to sovereign immunity, *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), and the Supreme Court's clear ruling that non-federal public agencies are not entitled to immunity if they are akin to municipalities. *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 280 ("The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the

State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.").

The dissent misconstrues our ruling as determining that there has been a waiver of Eleventh Amendment immunity: "The majority's unique use of state sovereign immunity doctrine as some kind of implied waiver of constitutional immunity constitutes an impermissible end run around the well-established principles of the Eleventh Amendment." Yet there is no "implied waiver" here. For something to be waived, it must initially have been applicable (prior to the waiver). The majority holds that the JRS never enjoyed immunity, because the JRS is akin to a municipality. The state cannot waive immunity that the JRS never had.

The state does not "waive" immunity by establishing a municipality or a municipality-like agency, in this or any other instance. Municipalities and municipality-like entities never enjoy immunity; these entities are created by state law, but there is no immunity to "waive" for these entities. Under the dissent's bizarre, erroneous use of the term "waive," a state would "waive" its immunity for a city, through the state's act of first establishing the city. The dissent's misunderstanding of the law stems from its unwillingness to accept that state law is a crucial part of defining the nature of a non-federal public entity in Eleventh Amendment analysis. *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 280; *Hall*, 742 F.2d at 303-04; *Jacintoport Corp.*, 762 F.2d at 439; *Blake*, 612 F.2d at 724.

Finally, the dissent argues that an alternative basis for dismissal exists, because the dissent concludes that Plaintiffs' claims fail on the merits. The district court never ruled on the merits, instead dismissing the case for lack of jurisdiction; thus, ordinarily it would be improper for this Court to issue the initial ruling on Defendants' motion for summary judgment. Moreover, on appeal, neither of the parties has

raised the issue of the merits of the claims; rather, the parties' appellate briefs discuss only the issue of jurisdiction. Because the merits of the claims are not argued on appeal, Defendants' motion for summary judgment cannot be addressed by this Court, in the present appeal proceeding. *E.g.*, *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 881 (6th Cir. 1996) ("Although plaintiff's notice of appeal indicates that she is appealing the entire district court judgment, she raises only the dismissal of her ADA claims in her brief on appeal. Accordingly, plaintiff has waived all other arguments.") (citation omitted). This Court will not rule on the merits at this stage.

## II.

Plaintiffs claim that the district court erred by not identifying the rule it relied upon in dismissing the case and in not affording Plaintiffs discovery regarding the Eleventh Amendment immunity issue. However, here, Plaintiffs fail to assert an additional meritorious basis for relief.

Neither Defendants' motion to dismiss nor the district court's opinion cited a subsection of FED. R. CIV. P. 12(b). Plaintiffs claim that Defendants' motion failed to meet the pleading standard, under FED. R. CIV. P. 7(b)(1) (requiring that a motion "shall state with particularity the grounds therefor"). However, we do not require a citation to a specific subsection of Rule 12, in asserting Eleventh Amendment immunity. In fact, although Eleventh Amendment immunity is a defense to jurisdiction, Defendants and the district court had good reason to avoid citing FED. R. CIV. P. 12(b)(1) (subject matter jurisdiction) or 12(b)(2) (personal jurisdiction): namely, the Supreme Court has dispelled the notion of this immunity as simply an issue of subject matter jurisdiction, without classifying this immunity as entirely an issue of personal jurisdiction. *See supra* note 4. Defendants and the district court acted properly when they cited the Eleventh Amendment itself as the controlling legal

authority–no specific citation to a subsection of Rule 12(b) was necessary.

Additionally, we note that if, *arguendo*, it were clear which subsection of Rule 12(b) were applicable, then this Court could substitute the proper subsection of Rule 12(b) for an erroneous or incomplete citation by the district court; this is assuming that, contrary to our ruling on issue I, above, Defendants had established Eleventh Amendment immunity.[25]

Since there was sufficient evidence on the record for us to reverse the grant of Eleventh Amendment immunity, we decline to entertain Plaintiffs' argument that the district court erred in failing to grant discovery.

### III.

Plaintiffs argue that the district court should be required to revisit the issue of assuming supplemental jurisdiction over Plaintiffs' state law claims if, as we concluded in issue I, above, Defendants are not entitled to Eleventh Amendment immunity on all of the claims.

---

[25] In civil cases, a district court's error in form–such as citing the wrong subsection of a rule of civil procedure, or providing analysis that fails to discuss certain relevant issues–does not provide grounds for automatic reversal or remand. Rather, this Court can affirm a ruling of a district court for any valid grounds stated on the record. *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994) ("we may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court") (citations omitted). *Cf.* FED. R. CRIM. P. 32(i)(3)(B) (formerly FED. R. CRIM. P. 32(c)(1)) (in federal criminal cases, at the sentencing phase, district courts are required to set out specific findings on controverted matters); *United States v. Osborne*, 291 F.3d 908, 911-12 (6th Cir. 2002) (under FED. R. CRIM. P. 32, a district court's failure to set forth the appropriate findings on controverted matters provides grounds for this Court to vacate a sentence and remand for re-sentencing).

A district court's decision to decline supplemental jurisdiction over state law claims is reviewed for abuse of discretion. As stated in *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996),

A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims. *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank of Detroit*, 738 F.2d 163, 166 (6th Cir. 1984). That discretion, however, is bounded by constitutional and prudential limits on the use of federal judicial power. *Gibbs* itself expressed one of the most important of these limits: "Certainly, if the federal claims are dismissed before trial, even though [the federal claims are] not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." [*United Mine Workers v.*] *Gibbs*, 383 U.S. [715,] 726 [, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).]

*See also Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 983 (6th Cir. 1993) ("because the district court properly dismissed plaintiff's federal claims for lack of subject matter jurisdiction, the district court also was within its discretion to dismiss plaintiff's pendent state law claims without prejudice.") (citations omitted).

Under 28 U.S.C. § 1367(c):

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The district court concluded that each of these four provisions would provide independent grounds for declining supplemental jurisdiction. *Ernst v. Roberts*, 225 F. Supp. 2d at 790. Because Eleventh Amendment immunity does not apply, the district court erred in stating that § 1367(c)(3) would provide cause for declining supplemental jurisdiction. However, Plaintiffs wrongly identify the district court as relying solely on § 1367(c)(3). Plaintiffs do not challenge the other three independent reasons for declining supplemental jurisdiction. A district court has "broad discretion" in deciding whether to exercise supplemental review. *Musson Theatrical*, 89 F.3d at 1254. Plaintiffs fail to establish error in any of the district court's three other independent, unchallenged reasons for declining supplemental jurisdiction. Therefore there was no abuse of discretion.

Of course, nothing would prevent the district court from reconsidering its exercise of discretion, on its own volition, in light of our remand of the federal claims. Under 28 U.S.C. § 1367(c), the district court has the option of declining supplemental jurisdiction if any one of the provisions apply, but the district court is not bound to decline supplemental jurisdiction merely because one or more provisions apply. By declining to instruct the district court to reconsider the issue of supplemental jurisdiction, in light of our reversal of the dismissal of all federal claims, we in no way impair the district court's discretion to exercise supplemental jurisdiction, notwithstanding the applicability of other provisions of 28 U.S.C. § 1367(c). *Indep. Enters. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1170 n.3 (3d Cir. 1997) ("The district court, having dismissed the federal claims, declined to exercise supplemental jurisdiction over Independent's state claims and dismissed them without prejudice. It may reconsider that decision on remand in light of our disposition of the federal claims."). We simply refuse to interfere with the district court's discretion on this matter, at a stage in the proceedings when the district court has already set forth three independent, unchallenged reasons for declining supplemental jurisdiction.

## CONCLUSION

For the aforementioned reasons, we **REVERSE** the district court's dismissal of each of Plaintiffs' federal claims, and **REMAND** for proceedings not inconsistent with this opinion.

—————

**DISSENT**

—————

SUHRHEINRICH, Circuit Judge, dissenting. I dissent because I believe that the Eleventh Amendment bars all of the claims in this case. Further, the state law claims should have been dismissed under the doctrine of *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). Finally, to the extent that Plaintiffs have stated a valid federal equal protection claim for prospective injunctive relief, I would dismiss that claim because the state law at issue has a rational basis and is therefore not unconstitutional.

**I.**

The case before us involves a straightforward application of Eleventh Amendment principles. In *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court held that the Eleventh Amendment bars suits against a state by its own citizens. *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002). Here, the state is not a named party; various state officials are the named defendants. The Eleventh Amendment does not preclude official capacity suits against state officials for injunctive relief. *Ex parte Young*, 209 U.S. 123 (1908). However, it prohibits a federal court from awarding retroactive monetary relief against state officials when those damages will be paid by the state treasury. *See, e.g., Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945). In *Ford Motor Co.*, the Supreme Court said: "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co.*, at 464. In short, "[a] federal court may order future compliance by state officials, but it may not compel payment of damages to

compensate for past violations." Erwin Chemerinsky, Federal Jurisdiction 425 (4th ed. 2003).

So the central question in this case is whether the state is the real, substantial party in interest even though the named defendants are Douglas B. Roberts, Treasurer of the State of Michigan; Christopher DeRose, Director, Department of Management and Budget Office of Retirement Systems; George M. Elworth, Member of the Michigan Judges Retirement Board ("MJRB"); Roy Pentilla, Member of the MJRB; Eric E. Doster, Member of the MJRB; Lyle Van Houten, Member of the MJRB; and Robert Ransom, Member of the MJRB.[1] To rephrase the issue a bit: by providing the requested relief, would we be ordering prospective injunctive relief, or monetary damages? And if the latter, where would the money come from?

**II.**

To answer these questions, we must examine the nature of the relief sought, which means examining the complaint. Precedent directs that "'[a] federal court must examine *each claim* in a case to see if the court's *jurisdiction over that claim* is barred by the Eleventh Amendment.'" *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 337 (6th Cir. 1990) (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984)). Counts I, III, V, and VII of the Complaint are based on the Equal Protection Clause of the Fourteenth Amendment and are brought pursuant to 42 U.S.C. § 1983. Count I alleges that the Act violates Plaintiffs' rights because judges of the 36th District Court are entitled to retirement allowance under the Tier I Plan which exceed that to which Plaintiffs and are entitled even though judges of the 36th District Court contribute a smaller percentage of their compensation into the Tier 1 Plan for that greater retirement allowance.

—————

[1] All of the defendants were sued in their official capacities.

Count III alleges that the Act does not provide for annual percentage increases in the retirement allowance paid under the Tier 1 Plan although certain of the statutes creating the retirement plans of other state and governmental employees provide for an annual percentage increase in the retirement allowance paid. Count V challenges the constitutionality of the Act because it prescribes the calculation of the retirement account value of the judges who transferred from the Tier 1 Plan to the Tier 2 Plan in a disparate manner. Count VII alleges that the Act violates the constitutional rights of Plaintiffs because per the terms of the Act judges of the 36th District Court who elected to transfer from the Tier 1 Plan to the Tier 2 Plan were able to transfer substantially greater amounts of money than non-36th District Court judges of the same age and same length of service because the Act, as complained of in Count I, afforded 36th District Court judges a higher allowance under the Tier 1 Plan.

Counts II, IV, VI, and VIII mirror Counts I, III, V, and VII, but instead of being founded upon the Equal Protection Clause of the Fourteenth Amendment, are founded upon Article I, Section 2 of the Michigan Constitution. Counts IX and X assert state law claims for wasting trust and breach of fiduciary duty, respectively.

Also critical to the analysis is the relief requested. Plaintiffs' prayer for relief reveals that the primary thrust of the suit is to obtain monetary relief.[2] In Paragraph 4, Plaintiffs ask that Defendants refund to members and beneficiaries of the Tier 1 Plan "that portion of their past contributions into the Tier 1 Plan in excess of the past

---

[2] Paragraphs 1 and 2 request the court to certify the action as a class action and declare that the Act violates the Fourteenth Amendment and the State Constitution. Neither are claims for prospective, injunctive relief.

contributions required of judges of the 36th District Court."[3] In Paragraph 5, Plaintiffs ask the court to afford to Plaintiffs who have remained members of the Tier 1 Plan but have not yet retired "a retirement allowance upon their retirements equal to that to which [comparable] judges of the 36th District Court" are or will be entitled.[4] Paragraph 6 seeks restitution in the form of "the difference between the dollar amount of retirement allowance" that Plaintiffs have received "and the greater amount of retirement allowance they would have received" if they were 36th District Court judges.[5] Paragraph 7 seeks an annual percentage increase in retirement allowance equivalent to the annual percentage increases afforded to other state funded retirement systems.[6] Paragraph 8 seeks

---

[3] 4. Order that Defendants forthwith refund to those Plaintiffs and members of The Class who are members, former vested members, retirants, or retirement allowance beneficiaries of the Tier 1 Plan, with interest, that portion of their past contributions into the Tier 1 Plan in excess of the past contributions required of judges of the 36th District Court[.]

[4] 5. Order Defendants to afford to Plaintiffs and The Class members who have remained members of the Tier 1 Plan but have not yet retired a retirement allowance upon their retirements equal to that to which judges of the 36th District Court with the same age and length of service are or will be entitled[.]

[5] 6. Order Defendants to forthwith make restitution to Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries by paying to them, with interest, the difference between the dollar amount of retirement allowance that they have received and the greater amount of retirement allowance that they would have received if they had been judges of the 36th District Court[.]

[6] 7. Order that Defendants forthwith afford to Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries of the Tier 1 Plan an annual

restitution in the form of "the difference between the dollar amount of retirement allowance equivalent to those afforded by other state funded retirement systems."[7]    Although couched in equitable terms, Paragraphs 4 through 8 in reality seek compensation for the State's past action which Plaintiffs perceive as inequitable.

Paragraphs 9 through 11 similarly seek to correct past errors by requiring Defendants to recalculate how benefits should be calculated.[8] Plaintiffs also seek an order allowing

---

percentage increase in retirement allowance equivalent to the annual percentage increase afforded by other state funded retirement systems which provide for annual percentage increases in benefits[.]

[7] 8.    Order that Defendants forthwith make restitution to those Plaintiffs and members of The Class who are retirants or retirement allowance beneficiaries of the Tier 1 Plan by paying to them, with interest, the difference between the dollar amount of retirement allowance equivalent to those afforded by other state funded retirement systems.

[8] 9.    Order Defendants to permit Plaintiffs and members of The Class the opportunity to terminate membership in the Tier 1 Plan and irrevocably elect to participate in the Tier 2 Plan as of a designated date certain each year, which date will be used for calculating APV[.]

10.    Order Defendants to permit Plaintiffs and members of The Class who have elected to transfer from the Tier 1 Plan to the Tier 2 Plan the opportunity to have the Actuarial Present Value ("APV") of their accounts recalculated as of a date subsequent to June 30, 1998 and order Defendants to transfer the difference between the recalculated APV and the APV previously calculated, with interest, from the reserves of the Tier 1 Plan to that person's Tier 2 account.

11.    Order that, as to Plaintiffs and members of The

---

them to revoke their original elections to participate in the Tier 2 Plan so that they can make their elections effective as of some different date in time.  Paragraph 12 asks the court to order the defendants to pay excess contributions.[9]  In short, the foregoing assertions all seek the equivalent of money damages that are more than incidental, and seek retroactive monetary relief.  Paragraphs 13 through 16 are not related to the federal constitutional claims, but are based on Plaintiffs' "wasting trust" claim under state law.[10]    Paragraphs 17

---

Class who have elected to transfer to the Tier 2 Plan, Defendants recalculate their APV as of the applicable APV date as though the Tier 1 Plan's accumulated benefit obligation to them was equivalent to that of a judge of the 36th District Court of the same age and length of service and transfer the difference between the recalculated APV and the APV previously calculated, with interest, from the reserves of the Tier 1 Plan to that person's Tier 2 Plan account[.]

[9] 12.    Order Defendants to pay The Excess Contributions to members, retirants and retirement allowance beneficiaries of the Tier 1 Plan[.]

[10] 13.    Preliminarily   and permanently enjoin Defendants from transferring or paying monies from the Tier 1 Plan's reserve for employer contributions to the court fee fund, from transferring or paying monies from the court fee fund to the court equity fund, and from transmitting court fees to the treasurer for deposit into the court fee fund instead of into the reserve for employer contributions[.]

14.    Order Defendants to cause the preparation of an annual report for the current fiscal year and future fiscal years that fully and accurately reports all of the reserve accounts of the Tier 1 Plan and of the court fee fund and all activities of the Tier 1 Plan, including but not

through 19 seek attorney fees, interest, and any other appropriate relief.[11]     Although not claims for prospective injunctive relief, they would likely be allowed as ancillary relief, *see Hutto v. Finney*, 437 U.S. 678 (1978), but only if the action were otherwise proper under § 1983. These are not

limited to the transfer or payment of monies out of the court fee fund into the court equity fund[.]

15.     Order Defendants to provide an accounting for past fiscal years of the various reserve accounts of the Tier 1 Plan, of the court fee fund, and of all of the activities of the Tier 1 Plan, including but not limited to the transfer or deposit of monies into and between the various reserve accounts of the Tier 1 Plan, the deposit of monies into the court fee fund, and the transfer of payment of monies out of the court fee fund into the court equity fund[.]

16.     Preliminarily   and permanently enjoin Defendants, their successors, and their agents from transferring to the treasury at the time of termination of the Tier 1 Plan those funds remaining in the various accounts in the Tier 1 Plan in excess of those needed to pay retirement allowances to members, vested former members, retirants and retirement allowance beneficiaries of the Tier 1 Plan and order Defendants and their successors to pay such funds to those persons who at time of termination are members, vested former members, retirants, or retirement allowance beneficiaries[.]

[11] 17.     Award Plaintiffs and members of The Class attorneys fees pursuant to 42 USC § 1988[.]

18.     Award Plaintiffs and members of The Class interest to which they are entitled; and

19.     Award Plaintiffs and members of The Class such additional or different relief to which they are entitled.

claims for prospective injunctive relief.  Only paragraph 3, which I will discuss momentarily, appears to seek prospective injunctive relief.[12]

### III.

So the question becomes, if the requested relief is ordered, where would the money come from?  Because all of the defendants are sued in their official capacities, it is anticipated that the monies would come from the related  agencies, the JRS, and the state treasury (the state treasurer Douglas Roberts, is also a named defendant).   This brings us to the next issue, is the JRS an arm of the state for purposes of the Eleventh Amendment?  As the majority correctly states, "[i]n Eleventh Amendment analysis, the question of whether a public entity is best characterized as an arm or alter ego of the state, instead of being deemed a political subdivision of the state, hinges on whether there is potential legal liability of the state treasury to satisfy a judgment." *Maj. Op.* at 8 (footnote omitted).   As this Court recently observed in *Dubuc v. Michigan Bd. of Law Exam'rs*, 342 F.3d 610 (6th Cir. 2003): "To determine whether an entity is a state department or agency for purposes of the Eleventh Amendment, the primary issue is whether the state would ultimately be liable for any money judgment against the entity." *Id.* (quoting *Brotherton v. Cleveland*, 173 F.3d 552, 560-61 (6th Cir. 2003)).[13]

[12] 3.     Preliminarily   and   permanently enjoin Defendants from requiring those Plaintiffs and members of The Class who have remained as participants in the Tier 1 Plan to contribute a higher percentage of their compensation for a retirement allowance than judges of the 36th District Court.

[13] Unlike the majority, I do not read *Dubuc, Brotherton*, and *Irvine* as basically rendering other factors irrelevant when evidence is presented regarding whether the state treasury would be liable for a judgment.

As the majority notes, there are two ways in which potential legal liability for a judgment against the JRS might reach state treasury funds. "First, JRS funds might be co-mingled with general funds–which is to say that JRS funds might be available for general use by the state for other purposes, unrelated to the retirement system. If funds are co-mingled, then any JRS liability would be tantamount to state treasury liability." The second method asks whether "even if JRS funds are segregated from state treasury funds, the JRS might not have sufficient funds to satisfy a judgment; applicable state law could make state treasury funds available to satisfy the part of the judgment that exceeded the amount of funds available to satisfy the part of the judgment that exceeded the amount of funds available to the JRS." *Maj. Op.* at 12.

The majority concludes that under the first method, "JRS funds are kept in a separate trust from general state funds–thus, funds taken from the JRS to satisfy a judgment would not be funds from the state treasury." *Maj. Op.* at 13.[14]

---

[14] I disagree with this conclusion as well, because it is contrary to the statutes establishing the JRS, which require the State Treasurer to invest JRS assets like all other assets of the State. Mich. Comp. Laws § 38.2206(1), 38.1132-38.1140i. The Act requires the State Treasurer to deposit JRS funds in the same manner as and subject to the laws governing the deposit of other State funds. *Id.* § 38.2206(1).

Other courts have held that funds deposited in a retirement system do not lose their fundamental character as public funds. *See Fitzpatrick v. Bitzer*, 519 F.2d 559, 565 n.4 (2d Cir. 1975), *aff'd in part, rev'd in part on other grounds*, 427 U.S. 445 (1976). Relatedly, courts have held that retirement systems are arms of the state and therefore entitled to Eleventh Amendment immunity. *See, e.g., McGinty v. New York*, 251 F.3d 84 (2d Cir. 2001) (holding that the New York Retirement System is an arm of the state; dismissing the plaintiffs' claims as barred by the Eleventh Amendment); *JMB Group Trust IV v. Pennsylvania Mun. Ret. Sys.*, 986 F. Supp. 534, 538 (N.D. Ill. 1997) (holding that the Pennsylvania Retirement System was an arm of the state where the duties and responsibilities of the Retirement System were "totally defined and limited by the Commonwealth of Pennsylvania under the provisions of the Pennsylvania Code"); *Schulthorpe v. Virginia Ret. Sys.*, 952 F. Supp. 307

In other words, there is no commingling of funds. Regarding the second method, the majority recognizes that, other things being equal, the state treasury might be liable for any shortfall

---

(E.D. Va. 1997) (holding that Virginia's Retirement System is an arm of the state entitled to Eleventh Amendment immunity); *Mello v. Woodhouse*, 755 F. Supp. 923 (D. Nev. 1991) (holding that suit against the Nevada Public Employees' Retirement Board was barred by the Eleventh Amendment).

*Blake v. Kline*, 612 F.2d 718 (3d Cir. 1979), cited by the majority, is not particularly persuasive. Although the Third Circuit directed the district court to consider on remand an opinion by the Pennsylvania Attorney General stating that the money deposited in the retirement fund had lost its identity as Commonwealth funds, the Court ultimately stated that the district court needed to determine whether the state, in making a contribution, was acting in the role of sovereign or some other capacity. *Id.* at 724.

Other factors, *see Hall v. Med. College of Ohio*, 742 F.2d 299, 302 (6th Cir. 1984), reflect that the JRS is an arm of the state. The Michigan Judges Retirement System and the Michigan Judges Retirement Board were created by the Michigan Judges Retirement Act. of 1992, Mich. Comp. Laws §§ 38.2101-2670. The Act mandate that the Board consist of the State Treasurer and the Attorney General of Michigan, as well as one sitting judge and two additional members appointed by Governor of Michigan with the advice and consent of the Michigan Senate. Mich. Comp. Laws § 38.2202(1). The Act is integrated with other Michigan departments. Indeed, the Michigan Judges Retirement Board "is created in the department [of management and budget]." §§ 38.2202(1); 38.2104(5). The Michigan Department of Management is responsible "for the budgeting, procurement, and related management functions of the retirement system." *Id.* § 38.2206(1). The State Treasurer "is the treasurer of the retirement system." *Id.* § 38.2206(l). The Michigan Attorney General is the Board's legal advisor and represents the Board in all litigation. *Id.* § 38.2207. The retirement system is required to prepare an annual report each fiscal year "regarding the financial, actuarial, and other activities of the retirement system," and present it to the Governor and Legislature. *Id.* § 38.2209. Furthermore, "[t]he retirement system shall draw its warrants upon the state treasury, payable out of funds of the retirement system, for the payment of retirement allowances, accumulated contributions, and the payment of salaries and other expenses necessary in the administration of the retirement system." *Id.* § 38.2208. The retirement system, is funded, in part, by annual legislative appropriations and other public monies. *Id.* 38.2303, 38.2304.

pursuant to Art. IX, § 24 of the Michigan Constitution. *See* Maj. Op. at 19. That provision states:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

*Musselman v. Governor*, 533 N.W.2d 237, 240 n.7 (Mich. 1995), *on reh'g on other grounds*, 450 N.W.2d 346 (Mich. 1996). The provision itself is clear, and *Musselman* further indicates that the state is obligated to prefund said benefits: "We hold that the state is obligated to prefund health care benefits under art. 9, § 24." *Id.* at 246.

However, *Musselman* also held that Article IX, § 24 is not self-executing:

In other words, insofar as the plaintiffs are asking us to require the Legislature to appropriate funds for retirement health care benefits, we understand that the intention of the drafters was that the second sentence of Const. 1963, art. 9, § 24 is not self-executing. Because the provision does not alter the rule that legislative action is necessary to appropriate funds, it fails to "'lay[]down rules by means of which [its] principles may be given the force of law.'"

*Id.* (alteration in original; footnote omitted); *see also id.* ("However, because we have no authority to order the Governor or the Legislature to appropriate funds, mandamus is denied.")

The majority acknowledges that "[a]bsent the *Musselman* case, it might have been argued that the state treasury could

have been held liable pursuant to Art. IX, § 24." Maj. Op. at 19; *see also id.* at 7 n.8 ("Various federal claims in this case clearly seek monetary relief, including the refund and payment of portions of Plaintiffs' contributions to the JRS."). The majority nonetheless concludes that because *Musselman* "establishes that Art. IX, § 24 does not create any right of action that could force state treasury funds to be used to pay any judgment against the JRS," Maj. Op. at 15, there is no Eleventh Amendment immunity bar to suit. *See* Maj. Op. at 7 n.8 ("Because we hold that none of the claims for monetary relief are covered by Eleventh Amendment immunity, we need not reach the issue of whether there are any federal claims seeking only prospective, non-monetary relief."). The majority's conclusion that the Eleventh Amendment is not implicated, despite the provisions of Art. IX, § 24, is based on the following reasoning:

[t]here can be no action in any court to force the state treasury to pay any part of a judgment relating to a federal claim in a lawsuit concerning the JRS—thus, the state treasury is not subject to potential legal liability. Even if the JRS lacked sufficient funds to satisfy a judgment in this case, the state treasury could not be held liable for any unpaid portion of the judgment.

Maj. Op. at 17-18.

In other words, the majority reasons that, because state law says that the money cannot come from the state treasury, a federal court could not order such relief either, so there is no need to worry about the Eleventh Amendment. This reasoning is faulty because a state's exercise of state sovereign immunity does not control the question of federal constitutional immunity. *Cf. Dubuc*, 342 F.3d at 617 (stating that "[w]hile [a provision of the Michigan Supreme Court Rules Concerning the State Bar of Michigan providing the staff of the State Bar and the Board of Law Examiners] may immunize the individual defendants from state law claims, no state law or rule can immunize anyone from liability for

violating the United States Constitution").[15]  In fact, on the flip side, the Supreme Court has consistently held that a state does not waive its Eleventh Amendment immunity by *consenting* to suit only in its own courts. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990) (citations omitted); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) ("Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*."); *Pennhurst*, 465 U.S. at 99-100 n.9 (citations omitted); *Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Assn.*, 450 U.S. 147, 150, 1981 (per curiam); *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944) ( "[I]t is not consonant with our dual system for the Federal courts to be astute to read the consent to embrace Federal as well as state court. . . . [A] clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found").  By the same token, the state should not lose its constitutional immunity simply because it exercised its state sovereign immunity.[16]    As the foregoing precedent establishes, the state must make its consent to suit in federal court clear.

---

[15]In *Dubuc*, the individual defendants, all of whom were sued in their official capacities, argued that they were immune from the federal claims under 42 U.S.C. § 1983 because *state* law made them "absolutely immune from suit for conduct arising out of the performance of their duties." *Dubuc*, 342 F.3d at 617.  This Court rejected this argument because state law cannot insulate the defendants from violations of federal law.  It is for this proposition that I cited *Dubuc*, and no other.  Thus, the doctrine of *Ex Parte Young* was therefore applicable to the individual defendants sued in their official capacities.

[16]This leads to a curious result:  although the state cannot be sued in state court because it has exercised its sovereign immunity, it can be sued in federal court because it cannot be sued in state court.

The *raison d'etre* for the Eleventh Amendment is to protect, in a federal forum, a state's exercise of sovereignty immunity.  As recently observed by a majority of Justices in *Seminole Tribe of Fla. v. Florida*,  517 U.S. 44 (1996):

Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 . . . (1991).  That presupposition, first observed over a century ago in *Hans v. Louisiana*, 134 U.S. 1, . . . (1890), has two parts:  first, that each State is a sovereign entity in our federal system; and second, that "'[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,'" *id.*, at 13 . . . (emphasis deleted), quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton).  See also *Puerto Rico Aqueduct and Sewer Authority, supra,* [506 U.S. 139 1993] at 146 ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity").  For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans, supra*, at 15. [Fn7]

---

FN7.  *E.g., North Carolina v. Temple*, 134 U.S. 22, 30, 10 S. Ct. 509, 511, 33 L. Ed. 849 (1890); *Fitts v. McGhee*, 172 U.S. 516, 524, 19 S. Ct. 269, 272, 43 L. Ed. 535 (1899); *Bell v. Mississippi*, 177 U.S. 693, 20 S. Ct. 1031, 44 L. Ed. 945 (1900); *Smith v. Reeves*, 178 U.S. 436, 446, 20 S. Ct. 919, 923, 44 L. Ed.1140 (1900); *Palmer v. Ohio*, 248 U.S. 32, 34, 39 S. Ct. 16, 16-17, 63 L. Ed. 108 (1918); *Duhne v. New Jersey*, 251 U.S. 311, 313, 40 S. Ct. 154, 64 L. Ed.280 (1920); *Ex parte New*

*York*, 256 U.S. 490, 497, 41 S. Ct. 588, 589, 65 L. Ed. 1057 (1921); *Missouri v. Fiske*, 290 U.S. 18, 26, 54 S. Ct. 18, 20-21, 78 L. Ed. 145 (1933); *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 51, 64 S. Ct. 873, 875, 88 L. Ed. 1121 (1944); *Ford Motor Co. v. Department of Treasury of Ind.*, 323 U.S. 459, 464, 65 S. Ct. 347, 350-51, 89 L. Ed. 389 (1945); *Georgia Railroad & Banking Co. v. Redwine*, 342 U.S. 299, 304, n. 13, 72 S. Ct. 321, 324, n. 13, 96 L. Ed. 335 (1952); *Parden v. Terminal Railway of Ala. Docks Dept.*, 377 U.S. 184, 186, 84 S. Ct. 1207, 1209-1210, 12 L. Ed. 2d 233 (1964); *United States v. Mississippi*, 380 U.S. 128, 140, 85 S. Ct. 808, 814-15, 13 L. Ed. 2d 717 (1965); *Employees of Dept. of Public Health and Welfare of Mo.*, 411 U.S. 279, 280, 93 S. Ct. 1614, 1615-1616, 36 L. Ed. 2d 251 (1973); *Edelman v. Jordan*, 415 U.S. 651, 662-663, 94 S. Ct. 1347, 1355-1356, 39 L. Ed. 2d 662 (1974); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S. Ct. 2666, 49 L. ed. 2d 614 (1976); *Cory v. White*, 457 U.S. 85, 102 S. Ct. 2325, 72 L. Ed. 2d 694 (1982); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 97-100, 104 S. Ct. 900, 906-908, 79 L. Ed. 2d 67 (1984); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 237-238, 105 S. Ct. 3142, 3144, 3145, 87 L. E.2d 171 (1985); *Welch v. Texas Dept. of Highways and Public Transp.*, 483 U.S. 468, 472-474, 107 S. Ct. 2941, 2945-2946, 97 L. Ed. 2d 389 (1987) (plurality opinion); *Dellmuth v. Muth*, 491 U.S. 223, 227-229, and n. 2, 105 L. Ed. 2d 181 (1989); *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S. Ct. 1868, 1872, 109 L. Ed. 2d 264 (1990); *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S. Ct. 2578, 2581, 115 L. Ed. 2d 686 (1991); *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144, 113 S. Ct. 684, 687-688, 121 L. Ed. 2d 605 (1993).

*Seminole Tribe*, 517 U.S. at 54. The majority's unique use of state sovereign immunity doctrine as some kind of implied waiver of constitutional immunity constitutes an

impermissible end run around the well-established principles of the Eleventh Amendment. If the state treasury is immune from liability for such purposes, it is because of the Eleventh Amendment and not Article IX, § 24 of the Michigan Constitution or the *Musselman* decision. And the Eleventh Amendment directs that if, as here, the state is the real party in interest, has not consented to suit *in a federal forum*, and monetary relief is sought, the suit must be dismissed.

Contrary to its assertion, the majority and I actually agree that state law plays a significant role in the Eleventh Amendment immunity analysis. However, I do not perceive Art. IX § 24 and the *Musselman* decision as leading to the conclusion that the JRS is not an arm of the state. Rather, I see them as *confirming* the contrary conclusion. Further, any funding requirement, even if it must be honored by the legislature and not ordered by a court, will necessarily impact on the state treasury. *Cf. Fitzpatrick v. Bitzer*, 519 F.2d 559 (2d Cir. 1975), *rev'd on other grounds*, 427 U.S. 445 (1976). (holding that "[a] judgment against the Connecticut State employees fund would automatically increase the obligations of the general state treasury and amount to a judgment against the state" because the state was required to appropriate funds annually on an actuarial basis such that at least 75% of the total retirement income payment for each year had to made by the state). *See generally Edelman*, 415 U.S. at 664 (stating that "the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter" (internal quotations omitted)); *see id.* n.11 (stating that "[t]he general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain" (internal quotations omitted)).

Finally, the majority fails to address the impact of Mich. Comp. Laws. § 38.2302, which imposes mandatory state contribution requirements:

Sec. 302. (1) Except as provided in subsection (2), the legislature shall annually appropriate to the retirement

system the amount determined under subsection (2) in order to fund the retirement system the amount determined under the fiscal year for which the appropriation is made. The legislature shall annually appropriate to the retirement system the amount determined under subsection (3) in order to reconcile the estimated appropriation made in the previous fiscal year with the actual appropriation needed to adequately fund the retirement system for the previous fiscal year.

(2) The legislature shall annually appropriate to the retirement system an amount equal to 3.5% of the aggregate annual compensation of the difference between the sum of the contribution rates determined under section 301(2) and (3) multiplied by the aggregate annual compensation and the estimated revenue from court fees under section 304, whichever is greater. The department shall submit the amount determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year. If the department receives notification from the United States internal revenue service that this subsection will cause the retirement system to be disqualified for tax purposes under the internal revenue code, this subsection does not apply and subsection (4) applies.

(3) Not later than 60 days after the termination of each state fiscal year, the bureau or retirement systems shall certify to the director of the department the actual aggregate annual compensation paid to all active members during the preceding state fiscal year and the difference, if any, between the actual actuarial funding requirement and the sum of the actual revenue received by the retirement system during the preceding fiscal year from the appropriation pursuant to subsection (2) or (4), whichever is applicable, employer contributions pursuant to section 303, court filing fees pursuant to section 304, and mandatory member contributions pursuant to section 305. The department shall submit the amount

determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year.

(4) If applicable, the bureau of retirement systems in the department shall certify to the director of the department an amount equal to the difference between the estimate actuarial funding requirement for the next fiscal year and the sum of the estimated revenue to be received by the retirement system during the next fiscal year from employer contributions pursuant to section 303, court fees pursuant to section 304, and mandatory member contributions pursuant to section 305. The department shall submit the amount determined under this subsection in the executive budget to the legislature for appropriation in the next fiscal year.

Mich. Comp. Laws Ann. § 38.2302 (West 1997). *See also* § 38.2208 (stating that "[t]he retirement system shall draw its warrants upon the state treasury, payable out of funds of the retirement system, for the payment of retirement allowances, accumulated contributions, and the payment of salaries and other expenses necessary in the administration of the retirement system"). In my view, the foregoing provisions clearly reflect that the state considers the JRS a state agency, in the department of budget and management, §§ 38.2201(1), 38.2104(5), funded by the treasury, and not merely a political subdivision.

In sum, I would affirm the district court's dismissal on the basis of Eleventh Amendment immunity.

### IV.

Plaintiffs' state law claims were also properly dismissed, although for reasons different than those stated by the district court. In *Pennhurst v. State Sch. & Hosp. v. Halderman*, *supra*, the Supreme Court held that the Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law, and also bars state law

claims brought under pendent jurisdiction. 465 U.S. at 103-06. This is true whether the relief sought is prospective or retroactive. *Id.* In distinguishing federal claims against state officials from state law claims against state officials, the Court reasoned that:

> This need to reconcile competing interests [the need to promote the supremacy of federal law vs. the constitutional immunity of the States] is wholly absent, however, when a plaintiff alleges that a state official has violated *state* law. In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106. Thus, even if only injunctive relief were sought, dismissal of Counts II, IV, VI, VIII, IX, and X was proper.

## V.

Paragraph 3 asks the court to enjoin Defendants from requiring Plaintiffs who have remained as participants in the Tier 1 Plan to pay a larger contribution to the JRS than the 36th District Court judges. Although couched as prospective language, in essence Plaintiffs seek to require the allocation of state funds that are subject to the requirements of the Act.[17] Thus, the injunctive relief requested is not "truly prospective non-monetary relief," and it is not incidental; therefore, the

---

[17]This is equally true as to all of Plaintiffs' claims.

"primary thrust of the suit" remains the money. *See Barton*, 293 F.3d at 949. As we observed in *Barton*, "the interest of a sovereign in allocating state funds is a 'very serious' one," and "an attempt to force the allocation of state funds implicates core sovereign interests." *Id.* at 951 (quoting *Kelley v. Metro. County Bd. of Educ.*, 836 F.2d 986, 995 (6th Cir. 1987)). The Eleventh Amendment bars this type of claim as well. *See Barton*, 293 F.3d at 949-51 (discussing exception to doctrine of *Ex Parte Young*; stating that the injunctive relief must be truly prospective, non-monetary relief with only incidental impact on the state treasury, and that "[t]he dividing line, therefore, is whether the money or non-monetary injunction is the primary thrust of the suit").

Furthermore, even if this claim–and any of the others for that matter–truly seeks prospective, nonmonetary injunctive relief and is therefore not barred by the Eleventh Amendment, relief is still not appropriate if there is no constitutional violation. In my view, dismissal was proper because the JRS has a rational basis and therefore its application does not violate the federal equal protection clause. *See generally Terre v. Boraas*, 416 U.S. 1 (1974) (holding that in equal protection cases not involving a suspect classification or fundamental right, courts apply a rational basis test). As the Michigan Supreme Court ruled in *Harvey v. Michigan*, 664 N.W.2d 767 (Mich. 2003):

> The state, by assuming the entire funding of the pensions of 36th District judges in the financially distressed city of Detroit, made those pensions more secure. Certainly the Legislature would or could understand that this would induce competent and qualified attorneys to become judges or to remain judges, just as the legislation did in *Hughes* [*v. Judges Retirement Bd.*, 282 N.W.2d 160 (Mich. 1979)]. Accordingly, we agree that the trial court's holding that plaintiffs have not satisfied their burden to show that there was no rational basis for this legislation. Thus, the statute withstands constitutional scrutiny.

*Id.* at 774.[18]  I agree with the Michigan Supreme Court that the proper test is rational basis and that  the Judges Retirement Act easily passes constitutional scrutiny.  I would hold that Defendant state officials did not violate Plaintiffs' equal protection rights by enforcing the provisions of the Judges Retirement Act.

## VI.

For the foregoing reasons, I believe that we should affirm the judgment of the district court dismissing in its entirety Plaintiffs' complaint.

---

[18]In *Hughes v. Judges' Ret. Bd.*, 282 N.W.2d 160 (Mich. 1979), a group of already-retired judges challenged legislation amending the Judges Retirement Act to increase the pension benefits to judges who retired after its effected date.  The amendment caused the pension of new and still-active judges to be higher than retirees' benefits.  The Michigan Supreme Court analyzed the statute under the rational-basis test and concluded that statute was constitutional.  Ir reasoned that the legislation was rational because the Legislature was inducing "competent and qualified attorneys to become judges, or to remain judges if already in office."  *Id.* at 168.